**Elizabeth MILLER, Plaintiff,**

v.

**BENEFICIAL MANAGEMENT CORPORATION, Beneficial Management Corporation of America and Beneficial Corporation, Defendants.**

Civ. A. No. 89–3089 (AJL).

United States District Court,
D. New Jersey.

June 21, 1994.

Aron M. Schwartz, Vogel, Chait, Schwartz and Collins, Morristown, NJ, for plaintiff.

Michael K. Furey, Riker, Danzig, Scherer, Hyland & Perretti, Morristown, NJ, for defendants.

## OPINION

LECHNER, District Judge.

This is an action by plaintiff Elizabeth G. Miller ("Miller") against defendants Beneficial Management Corporation, Beneficial Management Corporation of America and Beneficial Corporation (collectively, "Benefi-cial"), alleging gender and age discrimination in employment in violation of Federal and state law. Jurisdiction is alleged pursuant to the Equal Pay Act, as amended, 29 U.S.C. §§ 206(d)(1) and 216(b) ("EPA"), the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 626, et seq. ("ADEA"), the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII") and 28 U.S.C. §§ 1331 and 1367.

Currently before the court is the motion by Beneficial for summary judgment dismissing the action pursuant to Fed.R.Civ.P. 56.[1] Also before the court is the cross-motion of Miller for partial summary judgment striking certain of Beneficial's affirmative defenses.[2] For the reasons set forth below, both motions are denied.

---

[1]. In support of its motion, Beneficial submitted: Memorandum of Law in Support of Beneficial's Motion for Summary Judgment (the "Beneficial Moving Brief"); Beneficial's Reply Memorandum in Support of its Motion for Summary Judgment (the "Beneficial Reply"); Statement of Facts Not in Dispute Pursuant to Local Rule 12G (the "Beneficial Moving 12G"); Affidavit of Judith W. Elass, dated 20 April 1994 (the "Elass Aff."); Affidavit of Cheri Carlson, dated 15 April 1994 (the "Carlson Aff."); Affidavit of William F. Fierke, dated 15 April 1994 (the "Fierke Aff."); Affidavit of Patricia Pickett, dated 18 April 1994 (the "Pickett Aff."); Affidavit of Yvonne Lamar, dated 18 April 1994 (the "18 Apr. 1994 Lamar Aff."); Affidavit of Darlene Bell, dated 15 April 1994 (the "Bell Aff."); Affidavit of Clair R. Swan, dated 15 April 1994 (the "Swan Aff."); Affidavit of Steve Bixenmann, dated 15 April 1994 (the "Bixenmann Aff."); Certification of Prince Kessie, dated 19 April 1994 (the "Kessie Cert."); Certification of Mary A. Ramsden, dated 18 April 1994 (the "Ramsden Cert."); Certification of Finn M.W. Caspersen, dated 23 March 1994 (the "Caspersen Cert."); Certification of James H. Gilliam, Jr., dated 23 March 1994 (the "Gilliam Cert."); Certification of Lynne Anne Anderson, dated 24 March 1994 (the "Anderson Cert."); Supplemental Certification of Lynne Anne Anderson, dated 19 April 1994 (the "Supp. Anderson Cert.").

In opposition to Beneficial's motion, Miller submitted: Plaintiff's Brief in Response to Defendants' Motion for Summary Judgment (the "Miller Opp. Brief"); Plaintiff's Rule 12G Counter-Statement (the "Miller Opp. 12G"); Certification of Elizabeth G. Miller, dated 6 April 1994 (the "6 Apr. 1994 Miller Cert."); Certification of Aron M. Schwartz, dated 7 April 1994 (the "Schwartz Cert."); Certification of Yvonne A. Lamar, dated 5 April 1994 (the "5 Apr. 1994 Lamar Cert."); Affidavit of Kathleen F. Biehl, dated 5 April 1994 (the "Biehl Aff."); Affidavit of Don Bacon, dated 4 April 1994 (the "Bacon Aff."); Affidavit of Yvonne A. Lamar, dated 25 April 1994 (the "25 Apr. 1994 Lamar Aff."); Affidavit of Dorothea Smith, dated 5 May 1994 (the "Smith Aff."); Certification of Edith Terwilliger, dated 12 May 1994 (the "Terwilliger Cert."); Deposition Transcript Excerpts Submitted by Plaintiff in Opposition to Defendants' Motion for Summary Judgment (the "Miller Opp. Transcripts"). Citations to deposition transcripts reproduced in the Miller Opposition Transcripts will be as: "[date] [deponent] Dep. at [page]." For example, page one of the transcript of the deposition of Charles E. Hance, taken 20 May 1993, will be cited as: "20 May 1993 Hance Dep. at 1."

[2]. In support of her motion, Miller has submitted: Plaintiff's Brief in Support of Motion for Partial Summary Judgment (the "Miller Moving Brief"); Plaintiff's Reply Brief on Motion for Partial Summary Judgment (the "Miller Reply"); Plaintiff's Rule 12G Statement in Support of Motion for Partial Summary Judgment (the "Miller Moving 12G"); Certification of Elizabeth Miller, dated 23 March 1994 (the "23 March 1994 Miller Cert."); Deposition Transcript Excerpts in Support of Plaintiff's Motion for Partial Summary Judgment (the "Miller Moving Transcripts"). Citations to transcripts reproduced in the Miller Moving Transcripts will be as: "[date] [deponent] Dep. at [page]." For example, page one of the transcript of the deposition of Finn M.W. Caspersen, taken 3 June 1993, will be cited as: "3 June 1993 Caspersen Dep. at 1."

In opposition to Miller's motion, Beneficial has submitted: Beneficial's Brief in Opposition to Plaintiff's Motion for Partial Summary Judgment (the "Beneficial Opp. Brief"); Beneficial's Rule 12G Statement in Opposition to Plaintiff's Motion for Summary Judgment (the "Beneficial Opp. 12G").

*Procedural History* [3]

Miller's claims of gender and age discrimination relate to her transfer from Beneficial's Legal Department to its Government Relations Department. Complaint and Jury Demand ("Complaint"), ¶ 7. In early 1984, Beneficial vice president David Ward ("Ward") informed Miller that Charles Walsh, vice president and Counsel for Government Relations ("Walsh"), and Ken Raatz, an employee in the Government Relations Department ("Raatz"), were to be terminated from their posts; Ward invited Miller to replace them. *Id.*, ¶¶ 7–8. Miller alleges she formally began working in the Government Relations Department on 1 July 1984, at which time she took over for both Walsh and Raatz. *Id.* According to Miller, despite assuming greater responsibilities than those handled by either Walsh or Raatz, her base salary was less than that of either of her predecessors. *Id.*, ¶¶ 9–12.

Miller commenced this action on 20 July 1989. As originally filed, the Complaint alleged violations of the EPA, ADEA, New Jersey Law Against Discrimination, N.J.S.A. §§ 10:5–1 *et seq.* ("NJLAD"), and the New Jersey Conscientious Employee Protection Act, N.J.S.A. § 34:19–1 *et seq.* ("CEPA"). *Id.*, ¶ 4. The Complaint requested "backpay, frontpay, compensatory damages, damages for psychological and emotional distress and/or humiliation, double damages, liquidated damages and punitive damages, as may be permitted under [F]ederal and state statute and common law." *Id.*, *ad damnum* clause, ¶ A. The Complaint further requested that Miller be restored "to the full pension and other benefits to which she would have been entitled and which she would have attained but for defendant's illegal conduct." *Id.*, ¶ B.

On 29 September 1989, Beneficial filed an answer to the Complaint, asserting six affirmative defenses. On 21 November 1989, Miller amended the Complaint, adding a claim under Title VII (the "Amended Complaint"). On 11 December 1989, Beneficial filed an answer to the Amended Complaint (the "Answer").

By letter opinion, dated 23 July 1990, Miller's claim under CEPA was dismissed pursuant to Fed.R.Civ.P. 12(b)(1). As a result of the dismissal of her CEPA claim, Miller's claims for prospective relief such as frontpay and reinstatement are no longer at issue. Miller has, in fact, conceded that the Amended Complaint no longer seeks prospective relief. *See* Miller Moving Brief at 16.

On 7 August 1991, Beneficial moved for summary judgment on, and/or dismissal of, the remaining claims in the Amended Complaint. By opinion, filed 18 October 1991 (the "18 October 1991 Opinion"), summary judgment was granted to Beneficial and the Amended Complaint was dismissed. *See Miller*, 776 F.Supp. at 970. On 19 November 1992, the Third Circuit reversed the 18 October 1991 Opinion and remanded the matter, holding that genuine issues of material fact existed as to whether Miller had been subjected to unlawful discrimination. *See Miller*, 977 F.2d at 847. Miller's claims under the EPA, ADEA, Title VII and the NJLAD were thereby reinstated.

On 9 July 1993, Beneficial moved before Magistrate Judge Dennis M. Cavanaugh (the "Magistrate Judge") for leave to amend the Answer to assert two additional affirmative defenses. By letter-opinion and order, dated 20 July 1993 (the "20 July 1993 Opinion and Order"), the Magistrate Judge denied Beneficial's request for leave to amend the Answer. By opinion, dated 20 September 1993, the 20 July 1993 Opinion and Order was reversed and Beneficial was granted leave to amend the Answer. *See Miller v. Beneficial Management Corp.*, 844 F.Supp. 990 (D.N.J. 1993).

On 24 September 1993, Beneficial filed an amended answer (the "Amended Answer"). In the Amended Answer, Beneficial asserted two affirmative defenses in addition to those six asserted in the Answer. The first of these (the "Seventh Affirmative Defense") alleges: "[Miller's] claims are barred by her misrepresentation and fraud as to her re-

---

**3.** For a more extensive statement of the facts and procedural history of this case, *see Miller v. Beneficial Management Corp.*, 977 F.2d 834, 835–41 (3d Cir.1992); *Miller v. Beneficial Management Corp.*, 776 F.Supp. 936, 940–51 (D.N.J.1991).

sume and applications for health, death and pension benefits related to her employment at Beneficial."[4] Amended Answer at 10. The second of the additional affirmative defenses (the "Eighth Affirmative Defense") alleges: "[Miller's] claims are barred as a result of her unauthorized removal of documents from Beneficial." *Id.*

By its instant motion, Beneficial seeks summary judgment dismissing the Amended Complaint based on Miller's misconduct as alleged in the Seventh and Eighth Affirmative Defenses. Miller's cross-motion seeks partial summary judgment striking the Seventh and Eighth Affirmative Defenses.

*Facts*

A. *Miller's Employment History and the Misconduct Originally Alleged as the Basis for the Seventh and Eighth Affirmative Defenses*

In support of the Seventh and Eighth Affirmative Defenses, Beneficial asserts that pre-trial discovery revealed certain misconduct on Miller's part. Beneficial asserts that had it known of this misconduct at the time of its occurrence, it would have terminated Miller. Beneficial argues this state of facts should bar any recovery by Miller.[5]

Miller contends Beneficial knew of her misconduct before the institution of this action and did not, in fact, terminate her employment. The undisputed facts with regard to Miller's employment history at Beneficial and her alleged misconduct are as follows:

In the fall of 1979, Miller submitted a resume (the "Resume") to Beneficial, seeking employment as an attorney.[6] *See* Deposition of Miller, dated 20 November 1993 (the "20 Nov. 1993 Miller Dep."), attached as Exhibit S to Anderson Cert., at 5. At that time, Miller was interviewed by Beneficial and was offered employment in Beneficial's Legal Department effective 2 September 1980. *Id.* at 7; Beneficial Moving 12G, ¶ 7.

On 27 August 1980, in preparation for her employment, Miller submitted the Resume and an employment application (the "Application") to Beneficial's Personnel Department. On the Application, Miller's signature appears below the following statement:

I certify that the answers given by me to all of the questions on this application and any attachments are, to the best of my knowledge and belief, true and correct and that I have not willingly or knowingly withheld any pertinent facts or circumstances. I understand that any omission or misrepresentation of fact in this application may result in refusal of or separation from employment upon discovery thereof. I understand that as part of the employment process the employer has the authority and privilege to investigate and verify the information that I have provided.

Application, attached as Exhibit A to Anderson Cert., at 3.[7]

---

4. When it filed the Amended Answer, the fraud Beneficial relied upon consisted of misrepresentations by Miller concerning her age. *See Miller*, 844 F.Supp. at 994. As discussed *infra* at 703–705, Beneficial now asserts it discovered additional fraud in preparing for trial.

5. The legal doctrine upon which Beneficial's Seventh and Eighth Affirmative Defenses rest is discussed *infra* at 707–718.

6. The Resume reflects that Miller's date of birth was 20 February 1931. *See* Resume, attached as Exhibit A to Anderson Cert., at 2. The Resume further reflects that Miller graduated "first in class, *magna cum laude*," from the University of Illinois in 1953. *Id.* at 1.

 Under the heading "Professional Experience," the Resume indicates Miller had "eleven years of teaching experience at the high school and junior high school levels...." *Id.* The Resume indicates Miller "left these positions because of pregnancies." *Id.* The Resume indicates Miller left one teaching position in 1971 because her husband accepted a position in a different area. *Id.*

7. In the Application, Miller stated her grade point average at the University of Illinois was 3.8 and that she graduated first in her class. Application at 3. The last digit of Miller's date of college graduation as reflected in the Application is a three written over a two. *Id.* Beneficial contends, based on this entry, that Miller misrepresented the date of her college graduation on the Application as 1952. *See* Beneficial Moving 12G, ¶ 41. Miller disputes this contention, arguing that when she completed the Application, she was "unsure as to whether or not she had graduated in 1952 or 1953." Miller Opp. 12G, ¶ 41; *see* 6 April 1994 Miller Cert., ¶¶ 3–4.

 The Application further reflects that Miller's date of graduation from high school was 1948, that she graduated in the top ten percent of her class and that her grade point average was 3.5. Application at 3.

In the course of Miller's "job orientation," she signed and submitted to Beneficial a "Service Record Employment Contract" (the "Employment Contract"). Beneficial Moving 12G, ¶ 9. On the Employment Contract, Miller represented her date of birth as "2–20–1931." Employment Contract, attached as Exhibit B to Anderson Cert.

On 2 September 1980, Miller signed and submitted to Beneficial an "Employee's Death Benefit Plan Enrollment Card" (the "Death Benefit Card"). On the Death Benefit Card, Miller stated her date of birth as 20 February 1931. *See* Death Benefit Card, attached as Exhibit C to Anderson Cert. On 22 September 1980, Miller signed and submitted to Beneficial an "Enrollment Card—Group Health Insurance" (the "Health Insurance Card"). On the Health Insurance Card, Miller represented her date of birth as 20 February 1931. *See* Health Insurance Card, attached as Exhibit C to Anderson Cert.

In September 1980, shortly after Miller began work at Beneficial, Beneficial obtained Miller's high school, college and law school transcripts (the "Academic Transcripts"). *See* Academic Transcripts, attached as Exhibit P–136 to Miller Opp. Transcripts. The Academic Transcripts showed Miller's true date of birth to be 20 February 1928. *Id.* They also, of course, contained a true listing of Miller's grades and dates of graduation from high school, college and law school. *Id.* Beneficial employed a person for the specific purpose of "cross-check[ing] transcripts and information like that against what was put down on employment applications." 17 Nov. 1993 Cole Dep. at 45.

Miller began her employment as an attorney with Beneficial on 2 September 1980. At that time, she joined Beneficial's Legal Department as an associate counsel. Beneficial Moving 12G, ¶ 2. Miller's employment at Beneficial was her first since graduation from law school. *Id.,* ¶ 8. In a "job description," Miller's duties were summarized as follows: "Provides legal advice to consumer finance subsidiaries regarding various aspects of operations." Beneficial Job Descrip-

tion, dated October 1982 (the "1982 Job Description"), attached as Exhibit D to Anderson Cert. Miller's duties also involved "work[ing] with representatives from various departments on developing and modifying practices and procedures to conform with legal requirements" and "provid[ing] legal advice in areas such as [F]ederal regulations, state license examinations, computer and credit bureau contracts ... [and] compliance with [F]ederal laws and regulations such as the Truth in Lending Act, the Equal Credit Opportunity Act, etc." *Id.*

While employed in the Legal Department, Miller's performance was regarded unevenly by her superiors. On 16 November 1983, Charles E. Hance ("Hance"), head of the Legal Department and Miller's immediate supervisor, completed an evaluation form, known as a "Bentrak," regarding Miller's performance (the "1983 Bentrak"). In the 1983 Bentrak, Hance stated Miller exhibited "good planning and organizing skills" and that her "motivation and cooperation," as well as her "initiative, energy and ambition," were "good." 1983 Bentrak, attached as Exhibit G to Anderson Cert., at 2. Hance further reported Miller's "job knowledge re[garding] bankruptcy" and other areas of law was "developing well." *Id.* Hance cautioned, however, that "senior field and headquarters personnel were dissatisfied with [Miller's] advice." *Id.* at 3. In a section marked "summary rating," Hance checked a box marked "Below Exp[ectations]." *Id.*

Testifying in a deposition in this action, Richard Bate ("Bate"), another of Miller's supervisors in the Legal Department, disagreed with the evaluation of Miller in the 1983 Bentrak. Bate stated Miller "was a very competent, solid, reliable attorney, and [that he] had complete confidence in her work." 23 June 1993 Bate Dep. at 45. Bate stated he did not find Miller to be lacking in any area of her performance. *Id.*

Following her receipt of the 1983 Bentrak, Miller "made some efforts towards finding other employment." Miller Opp. 12G, ¶ 17. To this end, she contacted a "headhunter"

---

In the "Employment History" section of the Application, Miller states she left her teaching jobs because her "husband changed companies" and "to complete third year of law school." *Id.* at 2.

and transmitted her resume to other employers. *See* Beneficial Moving 12G, ¶ 17; Miller Opp. 12G, ¶ 17.

In or about March 1984, Ward, head of Beneficial's Government Relations Department, approached Miller and asked her to join the Government Relations Department. 20 May 1993 Hance Dep. at 51–52. Miller accepted Ward's offer and began work in the Government Relations Department on 1 July 1984. Miller Opp. 12G, ¶ 12. The Government Relations Department "consists of a corporate staff operating out of Beneficial's headquarters and Government Relations Directors ("GRDs"), who function primarily as lobbyists in the field." Beneficial Moving 12G, ¶ 13. "Its functions include developing and presenting Beneficial's positions on issues to legislative and regulatory bodies at the [F]ederal and state levels" and coordinating political contributions. *Id.* These "[l]obbying and contribution activities are subject to disclosure and filing requirements, and the [Government Relations] Department must keep informed of, and comply with, these requirements." *Id.*

Miller's responsibilities in the Government Relations Department included "the preparation and filing of lobbying and political contribution reports and providing advice to the GRDs regarding compliance with laws governing their activities." *Id.*, ¶ 14; *see* Beneficial Job Description, dated October 1985 (the "1985 Job Description"), attached as Exhibit F to Anderson Cert. Miller was also responsible for creating and coordinating political action committees ("PACS") and monitoring laws regarding political contributions. *See* 1985 Job Description.

Miller was promoted to assistant vice president on 1 July 1985. *Id.*, ¶ 15. Even at this time, Miller's performance within the Government Relations Department was regarded unevenly by her superiors. For example, in a "Bentrak" evaluation form, dated 7 March 1986 (the "1986 Bentrak"), Miller's interpersonal and management skills were rated as "below exp[ectations]." *1986 Bentrak*, attached as Exhibit H to Anderson Cert., at 2, 4. Similarly, in a "Bentrak" evaluation form,

dated 14 October 1988 (the "1988 Bentrak"), Ward evaluated Miller as below expectations in administrative, interpersonal, professional and management skills. *See* 1988 Bentrak, attached as Exhibit I to Anderson Cert., at 2–7. Other evaluations, however, gave Miller higher marks for her performance. *See* Miller Opp. 12G, ¶ 16.

In or about May or June 1988, Miller covertly taped a conversation with Helen Perry ("Perry"), another Beneficial employee (the "Perry Conversation"). Miller Opp. 12G, ¶ 18; Beneficial Moving 12G, ¶ 18. Miller subsequently informed Perry the conversation was recorded. 9 June 1993 Miller Dep. at 461. On the day after the Perry Conversation took place, Miller informed Ward she had taped the Perry Conversation. *Id.* at 466. According to Miller, Ward did not respond verbally to this disclosure. *Id.* at 467.

Ward testified during a deposition in this action that he considered discharging Miller for her covert recording of the Perry Conversation. *See* Deposition of Ward, dated 30 June 1993 (the "30 June 1993 Ward Dep."), attached as Exhibit E to Anderson Cert., at 171. Hance, according to Ward, advised such action was inappropriate "since there was no company policy on the subject." *Id.* Ward's dissatisfaction with Miller's taping of the Perry Conversation was reflected in the 1988 Bentrak. *See* 1988 Bentrak at 4.

On 3 June 1988, in spite of the mixed evaluations of Miller's performance, Ward discussed with Finn M.W. Caspersen ("Caspersen"), then a member of Beneficial's Executive Committee, the possibility of promoting Miller to vice president. *See* 6 April 1994 Miller Cert., ¶¶ 12–13, Ex. F; Beneficial Moving 12G, ¶ 21. In February 1988, Miller had approached David Farris ("Farris"), president of Beneficial, regarding a promotion. Beneficial Moving 12G, ¶ 21. During a meeting on 1 September 1988 (the "September 1988 Bentrak Meeting"), Ward informed Miller she would not be promoted because of her evaluation in the 1988 Bentrak.[8] 30 June 1993 Ward Dep. at 186.

---

8. From 1 September 1988 through 26 September 1988, Miller was absent from work. Beneficial Moving 12G, ¶ 25. Miller was also absent from 21 October 1988 through 12 December 1988.

By letter, dated 19 September 1988 (the "19 Sept. 1988 Letter"), Miller informed Ward of her opinion that Beneficial's refusal to promote her was motivated by her age, which she stated was sixty.[9] *See* 19 Sept. 1988 Letter, attached as Exhibit M to Anderson Cert. In the 19 September 1988 Letter, Miller also accused other members of the Government Relations Department of engaging in unspecified illegal activities. *Id.*

Prompted by the 19 September 1988 Letter, Beneficial commenced an internal investigation of the Government Relations Department (the "Internal Investigation").[10] *See* Beneficial Moving 12G, ¶ 27. On 20 October 1988, Miller was transferred back to the Legal Department. *Id.*, ¶ 28.

In or about September 1988, Ward became "puzzled" by Miller's statements, in the 19 September 1988 Letter and at the September 1988 Bentrak Meeting, that she was sixty years old. *Id.*, ¶ 31. Ward thereupon reviewed Beneficial's personnel records regarding Miller. Deposition of Ward, dated 10 December 1993 (the "10 Dec. 1993 Ward Dep."), at 9. Ward discovered Miller's age, according to Beneficial's personnel records, was fifty-seven.[11] *Id.* at 14.

On 8 September 1988, Ward drafted an addendum to the 1988 Bentrak (the "1988 Addendum"). In the 1988 Addendum, Ward stated:

> [S]ince you brought up the subject of your age, I looked in the personnel records after you left for home on September 1 [after the September 1988 Bentrak Meeting] to see what they showed. You told the company that you were born in 1931 and would now be 57 years of age. You repeated a

number of times in the [September 1988 Bentrak Meeting] that you were 60 years old. A misrepresentation was made on one of those occasions, although I don't know which one.

1988 Addendum, attached as Exhibit P–132 to Miller Opp. Transcripts, at 2. The 1988 Addendum was circulated to Farris, Hance, Maryann Schneider ("Schneider"), Beneficial's Senior Vice President for Planning and Administration, and Lawrence X. Cole ("Cole"), Beneficial's Vice President for Human Resources. *Id.* at 1.

On 18 October 1988, Ward circulated a memorandum to Schneider, Hance and Cole (the "18 Oct. 1988 Memo"). In the 18 October 1988 Memo, Ward complained of several instances of "outright gratuitous fabrication" on Miller's part. 18 Oct. 1988 Memo, attached as Exhibit P–133 to Miller Opp. Transcripts. These included a "blatant lie by [Miller] to cover up her poor judgment in [a] business situation" and "her lying about her age on her employment application." *Id.*

On 15 November 1988, Miller submitted to Beneficial's Payroll Department a "Temporary Disability Benefits Claim" (the "1988 Claim"). In the 1988 Claim, Miller listed her date of birth as 20 February 1928. *See* 1988 Claim, attached as Exhibit P–136 to Miller Opp. Transcripts. Shortly thereafter, Beneficial vice president Marilyn Maher ("Maher") noted the discrepancy between the date of birth listed in the 1988 Claim and that listed on the Health Insurance Card. On 17 November 1988, Maher circulated a memorandum on the subject to Hance and Cole (the "17 Nov. 1988 Memo"). In the 17 No-

---

*Id.* Miller contends she was sick during these periods. *See* 10 June 1993 Miller Dep. at 690.

9. Miller also informed Ward that her age was sixty during the September 1988 Bentrak Meeting. Beneficial Moving 12G, ¶ 31.

10. The Internal Investigation was concluded on or before 2 December 1988; no wrongdoing on the part of the Government Relations Department was discovered. *See* Miller Moving Transcripts, Ex. P–144 (letter from Farris to Miller, dated 2 December 1988, informing her that Internal Investigation had been completed and had discovered no wrongdoing in the Government Relations Department).

11. Also in September 1988, Beneficial discovered Miller had misrepresented the date of her high school graduation on the Application. *See* 17 Nov. 1993 Cole Dep. at 40. Miller concedes that she graduated from high school in 1945, rather than 1948, as represented on the Application. 23 Mar. 1994 Miller Cert., ¶ 6. Miller does not dispute that this inaccuracy was intentional. *See* Miller Opp. 12G, ¶¶ 41, 47. Miller states, however, that she made this misrepresentation only "in order to be consistent with the incorrect date of birth set forth on [the] [R]esume." 23 Mar. 1994 Miller Cert., ¶ 6.

vember 1988 Memo, Maher informed Hance and Cole:

> As information, there is a discrepancy on the disability form which [Miller] completed with regard to her age. On our health and life records, she shows her age [*sic*] as 2/20/31 and on the disability form she shows it as 2/20/28.

17 Nov. 1988 Memo, attached as Exhibit P–136 to Miller Opp. Transcripts. Beneficial's "upper level managers in charge chose not to pursue the matter with [Miller] at that time...." Beneficial Moving 12G, ¶ 34.

Miller does not dispute that she wilfully falsified her date of birth on her Employment Contract, Resume, Death Benefit Card and Health Insurance Card.[12] Miller Opp. 12G, ¶ 38. Nor does she dispute that she failed to inform anyone at Beneficial of these misrepresentations during her employment. *Id.*, ¶ 43. She asserts, however, that she did so "because she was afraid she would have a difficult time finding [and keeping] employment due to age discrimination." *Id.*, ¶ 39; *see* 20 November 1993 Miller Dep. at 27.

Miller also admits that, throughout her employment at Beneficial, she routinely removed files from the office. 20 Nov. 1993 Miller Dep. at 69. Miller kept some of these files at home and some in her briefcase. *Id.* at 72. In explanation of this practice, Miller states she "worked a lot at home." *Id.* at 69. Miller states she did not ask anyone at Beneficial whether it was permitted to bring records home because "[e]veryone did this." *Id.* at 71. Miller admits, however, that she transmitted some of these documents to her attorney in the instant matter between October 1988 and January 1989. *Id.* at 231, 235.

Some of the documents Miller removed were "personnel documents [ (the "Personnel Files") ] that [she] would want for [her] records." *Id.* at 70. Some of these Personnel Files related to other employees. *Id.* at 73; *see* Anderson Cert., Ex. LL. Miller states

she took some of these "to protect [her]self because of the things ... that [she was] asked to do that were illegal." 20 Nov. 1993 Miller Dep. at 69. Others, she states, she took home because "they weren't perhaps as secure as they should have been in [her] office." *Id.* at 73.

Between about 1984 and 1 September 1988, Miller also routinely brought home several confidential memoranda containing legal advice given to Beneficial by her and by other attorneys (the "Opinion Memos"). *Id.* at 108–118. Miller states she brought the Opinion Memos home "to protect [her]self." *Id.* at 109. Miller elaborated: "If Beneficial got in trouble I wanted to be sure that I could protect myself by showing I was no part of that trouble." *Id.* at 109–10.

Between October 1988 and January 1989, Miller removed from Beneficial's offices several "lists of retainers and ... list[s] of political contributions" made by Beneficial and its employees (the "Contribution Lists"). Deposition of Miller, dated 8 June 1993 (the "8 June 1993 Miller Dep."), attached as Exhibit J to Anderson Cert., at 23–24; *see* Anderson Cert., Exs. MM, NN. Miller states she removed the Contribution Lists because she thought they might aid her in a lawsuit against Beneficial. *See* 8 June 1993 Miller Dep. at 24.

There is at least some evidence in the record that officers of Beneficial knew prior to the institution of this action that Miller was removing documents from Beneficial's offices. In or about September 1988, for example, Ward suggested to Cole that "Miller might have removed company documents." 17 Nov. 1993 Cole Dep. at 32. Cole did not follow up this information with further inquiry. *Id.* at 33.

On 3 October 1988, Ward addressed a memorandum to Hance entitled "Elizabeth G. Miller" (the "3 October 1988 Memo"). In

---

12. On 11 March 1989, Miller sent a letter (the "11 March 1989 Letter") to John McCardle ("McCardle"), a vice president in Beneficial's Payroll Department. In the 11 March 1989 Letter, Miller informed McCardle her date of birth was 20 February 1928 and that Beneficial "may have the wrong birth date in [its] records." 11 March 1989 Letter, attached as Exhibit G to 6

April 1994 Miller Cert., at 2. Miller testified during a deposition that she sent the 11 March 1989 Letter because she knew she had misrepresented her date of birth to Beneficial. Deposition of Miller, dated 20 November 1993 (the "20 Nov. 1993 Miller Dep."), attached as Exhibit S to Anderson Cert., at 27.

the 3 October 1988 Memo, Ward stated several concerns regarding Miller prompted by her 19 September 1988 Letter. *See* 3 October 1988 Memo, attached as Exhibit P–140 to Miller Moving Transcripts. Among these concerns, Ward stated: "You are also aware, I believe, that she has been asking for files relating to contributions. . . ." *Id.* Ward concluded the 3 October 1988 Memo by stating: "It is my feeling that she has simply decided some sort of litigation is what she wants." [13] *Id.* Copies of the 3 October 1988 Memo were circulated to Schneider, Farris and Eileen Caulfield ("Caulfield"), the Beneficial attorney in charge of the Internal Investigation. *Id.*

In or about October 1988, while conducting the Internal Investigation, Caulfield learned Miller had been removing documents from Beneficial over an extended period of time. *See* 13 Dec. 1993 Caulfield Dep. at 25–27. At some point during the Internal Investigation, Caulfield transmitted this information to Ward. *See* 10 Dec. 1993 Ward Dep. at 49–54. During "the first couple of weeks" of the Internal Investigation, Caulfield was informed by Miller that Miller had retained an attorney. 13 Dec. 1993 Caulfield Dep. at 33.

On 20 October 1988, Hance took notes of a phone conversation he had with James Gilliam ("Gilliam"), a senior vice president at Beneficial (the "Hance Phone Notes"). The Hance Phone Notes are captioned: "B. Miller . . . Priv & Conf & written in contempt of anticip litigation." Hance Phone Notes, attached as Exhibit P–147 to Miller Moving Transcripts. In the Hance Phone Notes, Hance notes Miller "asked for some time to work on her files (she has at home)." *Id.* Hance testified that, shortly after he took the Hance Phone Notes, he became aware that Miller was sending Caulfield documents related to the Internal Investigation "from someplace other than the office." 17 Nov. 1993 Hance Dep. at 165.

On 13 December 1988, Ward addressed a memorandum to Caspersen (the "13 Dec.

1988 Memo"). In the 13 December 1988 Memo, Ward stated, among other complaints about Miller: "[O]f course, we now know that she has been secretly accumulating files of company documents at home." 13 Dec. 1988 Memo, attached as Exhibit P–151 to Miller Moving Transcripts.

The next day, 14 December 1988, Hance addressed a memorandum to Miller (the "14 December 1988 Memo"), reporting that the Internal Investigation had been concluded and that there had been no indication of wrongdoing. *See* 14 Dec. 1988 Memo, attached as Exhibit Gilliam–1 to Miller Moving Transcripts. Hance also wrote:

> Beneficial . . . believes that much of the information and many of the documents that you have were obtained by you in the course of your acting as an attorney for the company and its affiliated companies. Please be advised that the company and its affiliated companies do not waive any attorney-client rights and privileges in connection with these matters, and we caution you to act accordingly. In this regard, please make sure that you do not breach any obligation owed to the company and its affiliated companies.

*Id.*

On 6 January 1989, Miller left Beneficial's employ. Beneficial contends Miller "voluntarily terminated her employment." Beneficial Moving 12G, ¶ 36. Miller counters she was "constructively discharged." Miller Opp. 12G, ¶ 36.

In the days following Miller's departure from Beneficial, Hance had discussions with Gilliam regarding offering Miller "the opportunity to continue in the employ of Beneficial." 17 Nov. 1993 Hance Dep. at 142. Hance recommended offering Miller continued employment because Miller "might have acted in leaving the company in a manner that she would subsequently decide was not as constructive as continuing employment with Beneficial." *Id.* at 143. Hance ex-

---

**13.** During deposition, Ward testified that, by 3 October 1988, he had assumed Miller, by "taking files," "was attempting to create some kind of record for litigation. . . ." 10 Dec. 1993 Ward Dep. at 33. As early as 9 September 1988, Miller had informed Ward she had retained an attorney

in connection with her relationship with Beneficial. Memorandum from Ward to Cole, dated 9 September 1988 (the "9 September 1988 Memo"), attached to Schwartz Cert. as Ex. A, at 1. On the same day, Ward transmitted this information to Cole. *Id.*

plained he thought Miller "might decide after a little reflection that it would be better for her to continue with her job at Beneficial and that [Beneficial] ought to make that opportunity available to her." *Id.* Gilliam agreed with Hance's assessment that an offer of re-employment "was the right thing to do." *Id.*

On 10 January 1989, Hance addressed a letter to Miller (the "10 Jan. 1989 Letter"). In the 10 January 1989 Letter, Hance wrote:

> On January 8, I advised you that we will keep your position for you, for two weeks, to give you the chance to reconsider continuing to work here. As I told you on January 8, we are not trying to get you to leave. We are trying to provide you with the opportunity of continuing to work here in a position that is meaningful and productive.

10 January Letter, attached as Exhibit P–152 to Miller Moving Exhibits, at 1. Hance then proceeded to address certain concerns Miller had expressed with respect to working conditions at Beneficial. *Id.* at 1–4. Hance concluded:

> I hope [this] explains my understanding of the developments and the current situation. I also hope it will serve as a basis for your reconsidering the opportunity to work here.

*Id.* at 5.

On 13 January 1989, Hance addressed another letter to Miller, enclosing checks for sums due Miller from Beneficial (the "13 Jan. 1989 Letter"). Hance concluded the 13 January 1989 Letter by stating:

> We are still keeping your position for you (as set forth in [the 10 January 1989 Letter]), and the issuance of these checks in no way affects that.

13 Jan. 1989 Letter, attached as Exhibit P–153 to Miller Moving Transcripts.

On 16 January 1989, Hance completed a form regarding Miller entitled "Beneficial Management Corporation Termination Form" (the "Termination Form"). In response to the question "Would you re-employ?," Hance checked the space marked

"Yes." Termination Form, attached as unmarked exhibit to Miller Moving Transcripts, at 1. After the query "Please explain," Hance wrote: "Re-employment would be to continue to provide ... Miller with the opportunity of a meaningful and productive position here." *Id.*

On 20 January 1989, Hance wrote yet another letter to Miller (the "20 Jan. 1989 Letter"), addressing her concerns about Beneficial and again offering her employment in Beneficial's Legal Department:

> I believe the position can be a meaningful and productive one, equivalent to your former position in the Government Relations Department.
>
> . . . . .
>
> I believe that you can work here in a meaningful and productive way, if you choose to do so, and if you can separate your working here from you dissatisfaction regarding the [Internal] [I]nvestigation and related matters.
>
> If you are interested in this position, please let me know within the next two weeks.

20 Jan. 1989 Letter, attached as Exhibit P–154 to Miller Moving Transcripts.[14]

After Hance had offered Miller re-employment with Beneficial, he discussed the offer with Cole. Though Cole did not agree with Hance's actions, he "accepted" Hance's decision. 17 Nov. 1993 Cole Dep. at 38. Cole did not express to Hance his reservations concerning the offer to re-employ Miller. *Id.* at 37.

Miller did not accept Beneficial's offers of re-employment. On 20 July 1989, as indicated, Miller commenced the instant suit. *See* Complaint.

### B. *Misconduct Alleged After Filing of Amended Answer*

Beneficial contends that, in preparing for trial, it discovered other fraudulent misrepresentations made by Miller on her Application

---

14. During this time frame, Caspersen was apparently aware that Miller had been offered re-employment at Beneficial. 13 Dec. 1993 Caspersen Dep. at 52. Caspersen does not recall whether he took any action in relation to the offer. *Id.* at 53.

and Resume.[15] Miller disputes Beneficial's assertion that these representations were fraudulent.

First, Beneficial contends Miller misrepresented her high school grade point average and class standing on her Application. Beneficial Moving 12G, ¶ 48. Miller admitted during deposition that her representations regarding her high school grade point average were inaccurate.[16] 20 Nov. 1993 Miller Dep. at 51. She stated, however, that those inaccuracies were not the result of fraud, but of faulty memory and mistaken estimation on her part. *Id.*

Beneficial further contends that, during discovery, it found that Miller misrepresented on the Application and Resume that she was first in her college class. Beneficial Moving Brief at 14. In support of this assertion, Beneficial has submitted letters from officials of the University of Illinois. The first of these, dated 2 November 1993 (the "2 November 1993 Letter"), is from William F. Fierke ("Fierke"), Associate Director for Records and Registration.[17] In the 2 November 1993 Letter, Fierke states Miller was awarded a Bachelor of Science degree, with high honors, in 1952. *See* 2 November 1993 Letter, attached to Fierke Cert. as Exhibit A. Fierke states Miller did not receive "University Honors," but instead received "College Honors." *Id.* Fierke explains University Honors is awarded to students who, "based on their cumulative grade point average of 4.5 or better through the academic term prior to their graduation, also rank in the top three percent of the graduating class...."[18] *Id.* Fierke states the University of Illinois does "not have any records listing a valedictorian." *Id.*

Beneficial has also submitted a letter, dated 30 November 1993 (the "30 Nov. 1993 letter"), from Cheri Carlson ("Carlson"), Admissions/Records Officer at the University of Illinois.[19] In the 30 November 1993 Letter, Carlson affirms Miller graduated with high honors in 1952. *See* 30 Nov. 1993 Letter, attached as Exhibit A to Carlson Cert. Carlson states:

> Although the University of Illinois does not rank its students, it is possible for us to determine whether ... Miller graduated first in her class ... by examining the Bronze Tablet records for the year in question.
>
> The Bronze Tablet honor is awarded in Spring semesters to the top three percent of the graduates in each college for that particular academic year. [ ] Miller did not receive Bronze Tablet recognition which indicates that she was not within the top three percent of our graduates for that year.

*Id.*

Miller contends she had reason to believe, when she submitted her Application and Resume, that she had graduated first in her college class. Miller provided documentation of her receipt of the Outstanding Senior in Education Award from the honorary society of Kappa Delta Pi in May 1952. *See* 6 April 1994 Miller Cert., Ex. A. The Chairperson of Kappa Delta Pi has certified: "Currently, [on 5 April 1994,] the Kappa Delta Pi Outstanding Senior Award is given to the student with the highest grade point average. As far as I am aware, the award has always been based on the highest grade point average." Smith Cert., ¶ 4. Miller testified in a deposition that she was told upon her gradu-

---

**15.** In the Miller Opposition Brief, Miller argued that much of the evidence of fraud submitted by Beneficial is inadmissible hearsay. By letter, dated 13 May 1994 (the 13 May 1994 Letter), Miller conceded that Beneficial "cured the hearsay deficiencies" prior to submission of the instant motions. *See* 13 May 1994 Letter at 2.

**16.** As indicated, in the Application, Miller stated her high school grade point average to be 3.5. *See* Application at 3. It appears from Miller's Academic Transcripts that Miller had a high school "scholastic average" of 2.951. Academic Transcripts at 5.

**17.** Fierke has certified that the information contained in the 2 November 1993 Letter is true and accurate. Fierke Cert., ¶ 2.

**18.** Beneficial argues that because Miller did not receive University Honors, she could not have been in the top three percent of her class. Beneficial Moving Brief at 14.

**19.** Carlson has certified that the information contained in the 30 November 1993 Letter is true and accurate. Carlson Cert., ¶ 2.

ation from the College of Education at the University of Illinois that she "was first—I was told I had the highest average from the College of Education." 20 Nov. 1993 Miller Dep. at 38; *see* 6 Apr. 1994 Miller Cert., ¶ 5 (certifying Miller was told by a professor upon her graduation that she had the highest grade point average in her class).

Edith Terwilliger ("Terwilliger"), Associate Dean of the College of Education at the University of Illinois, states in a letter to Miller, dated 31 January 1994 (the "31 Jan. 1994 Letter"), that Miller graduated from the College of Education with a cumulative grade point average of 4.598.[20] 31 Jan. 1994 Letter, attached as Exhibit A to Terwilliger Cert. Terwilliger indicates that, based on this grade point average, and on Miller's receipt of the Outstanding Senior in Education Award, "it is clear that [Miller was] among the top students academically in [her] class." *Id.*

Beneficial also argues Miller misrepresented her college grade point average on her Application. Beneficial Moving Brief at 15. Miller has admitted the 3.8 average represented on her Application is inaccurate. *See* 20 Nov. 1993 Miller Dep. at 52. As indicated, the 31 January 1994 Letter confirms that Miller graduated from the University of Illinois with a grade point average of 4.598.[21] 31 Jan. 1994 Letter; *see also* Academic Transcripts at 3.

Beneficial further contends Miller misrepresented her teaching experience on her Resume. As indicated, Miller represented on her Resume that she had eleven years of teaching experience at the "high school and junior high school levels." Resume at 1. During deposition, Miller admitted she had taught "some" of those eleven years at the elementary school level. *See* 20 Nov. 1993 Miller Dep. at 41. Miller states, however, that when drafting her Resume, she believed it to be an "accurate summary of her teaching experience and had no intention of pro-

viding inaccurate information...." 6 Apr. 1994 Miller Cert., ¶ 8.

On her Resume, Miller also represented she participated in several community organizations. *See* Resume at 2. In support of its motion, Beneficial submitted letters from certain of these community organizations which were unable to confirm Miller's involvement. Beneficial contends the letters indicate Miller did not, in fact, participate in these organizations. Beneficial Moving Brief at 16. The letters submitted by Beneficial, however, state the community organizations listed by Miller on her Resume do not have sufficient records to verify Miller's involvement with them. *See* Anderson Cert., Exs. EE, FF, UU, HH.

Finally, Beneficial contends the Resume misrepresented the reasons Miller left her teaching jobs. For this contention, Beneficial relies on Miller's representation in her Resume that she left her teaching positions "because of pregnancies." Resume at 1. During a deposition, Miller stated she left teaching jobs for reasons other than her pregnancies, such as when she and her husband were moving "or [her] husband had taken a job." 20 Nov. 1993 Miller Dep. at 55. Beneficial contends that, in light of this deposition testimony, Miller's representation that she had left her teaching jobs because of pregnancies was an intentional misrepresentation. Beneficial Moving Brief at 15.

## C. *Beneficial's Employment Policies*

Beneficial, as stated, contends it would have terminated Miller's employment had it known of these instances of misconduct when they occurred. In support of this assertion, Beneficial offers evidence relating to its employment policies and practices in general and as applied to other employees.

Beneficial's "Staff Service Bulletin" (the "Bulletin") provides "general guidance, direction and assistance concerning the [c]ompany's employment policies and procedures."

---

**20.** Terwilliger has certified that the information contained in the 31 January 1994 Letter is true and accurate. *See* Terwilliger Cert., ¶ 2.

**21.** This statement of Miller's college grade point average is confirmed by the Academic Transcripts. *See* Academic Transcripts at 3. Miller

testified she misstated her grade point average on the Application because, when filling out the Application, she had forgotten that the University of Illinois operated on a five-point grading scale. *See* 20 Nov. 1993 Miller Dep. at 52.

Bulletin, attached as Exhibit BB to Anderson Cert., at 1. Section 13.12 of the Bulletin is entitled "Termination Policy." Under this heading, the Bulletin provides:

> Employees may be released without notice or salary ... for misconduct. Misconduct is defined as a violation of company policy or conduct inconsistent with an orderly workplace. Misconduct may include by way of example, but not limitation, commission of an illegal or violent act, violation of Beneficial's alcohol and drug abuse policy, dishonesty, mismanagement of company funds or property, wilful failure or refusal to discharge duties or harassment of fellow employees or supervisors in the workplace.

Bulletin § 13.12 at GC59934.

Schneider, Beneficial's Vice President for Human Resources, and Farris, Beneficial's president, both testified during depositions that it was Beneficial's practice, pursuant to the policy stated in the Bulletin, to terminate employees who had provided false information on their employment applications or resumes. *See* Deposition of Schneider, dated 9 November 1993 (the "9 Nov. 1993 Schneider Dep."), attached as Exhibit Q to Anderson Cert., at 43; Deposition of Farris, dated 11 January 1994 (the "11 Jan. 1994 Farris Dep."), attached as Exhibit DD to Anderson Cert., at 18.

Responding to interrogatories, Beneficial stated that, between 1 January 1985 and 31 December 1992, it "terminated approximately 320 employees for violation of a company policy, dishonesty or willful misconduct." Anderson Cert., Ex. CC. at 16. After reviewing the personnel files of twenty-three employees terminated during this period, Beneficial found seven instances where employees were terminated for making false representations on company documents. *Id.* at 17–19. Of these seven terminations, three were for resume or job application fraud. *Id.* In addition, in 1986, Beneficial placed an employee on probation for misrepresenting that she had graduated from high school. *Id.* at 19.

*Discussion*

A. *Standard for Grant of Summary Judgment*

To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The present task is to determine whether disputed issues of fact exist, but a district court may not resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *see also Desvi, Inc. v. Continental Ins. Co.,* 968 F.2d 307, 308 (3d Cir.1992) ("threshold inquiry is whether there are 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party' ") (citations omitted); *Gray v. York Newspapers, Inc.,* 957 F.2d 1070, 1078 (3d Cir.1992) ("We apply the test ... (1) Is there no genuine issue of material fact and (2) is one party entitled to judgment as a matter of law?") (quotations omitted); *Hackman v. Valley Fair,* 932 F.2d 239, 241 (3d Cir.1991) ("summary judgment is inappropriate when a conflict of a material fact is present in the record"); *Nathanson v. Medical College of Pennsylvania,* 926 F.2d 1368, 1380 (3d Cir. 1991) (summary judgment may not be granted "if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed").

All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Williams v. New Castle County,* 970 F.2d 1260, 1264 (3d Cir.1992); *Boyle v. Governor's Veterans Outreach & Assistance Ctr.,* 925 F.2d 71, 75 (3d Cir.1991); *Weldon v. Kraft, Inc.,* 896 F.2d 793, 797 (3d Cir.1990); *Todaro v. Bowman,* 872 F.2d 43, 46 (3d Cir.1989). "Any 'unexplained gaps' in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment." *Ingersoll–Rand Fin. Corp. v. Anderson,* 921 F.2d 497, 502 (3d Cir.1990) (quoting *O'Donnell v.*

*United States,* 891 F.2d 1079, 1082 (3d Cir. 1989)).

Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a genuine issue of material fact,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with *"specific facts* showing that there is a *genuine issue for trial."* Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

*Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1355–56 (emphasis in original, citations and footnotes omitted). In other words, the inquiry involves determining " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Brown v. Grabowski,* 922 F.2d 1097, 1111 (3d Cir.1990) (quoting *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2511–12), *cert. denied sub nom., Borough of Roselle v. Brown,* 501 U.S. 1218, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991); *see also Gray,* 957 F.2d at 1078 ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party").

The Supreme Court elaborated on the summary judgment standard in *Anderson:* "If the evidence [submitted by a party opposing summary judgment] is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted). The Supreme Court went on to note in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Id.* at 323–24, 106 S.Ct. at 2553 (footnote omitted); *see also Coolspring Stone Supply, Inc. v. American States*

*Life Ins. Co.,* 10 F.3d 144, 148 (3d Cir.1993) ("nonmoving party must adduce more than a mere scintilla of evidence in its favor"); *Maguire v. Hughes Aircraft Corp.,* 912 F.2d 67, 72 (3d Cir.1990) (non-moving party may not rest upon mere allegations); *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990) (neither unsupported allegations in pleadings and memoranda of law nor conclusory allegations in affidavits will establish genuine issue of material fact); *Aronow Roofing v. Gilbane Building Co.,* 902 F.2d 1127, 1128 (3rd Cir.1990) ("summary judgment will be granted where the non-moving party fails to 'establish the existence' of an element essential to the case").

"As a general rule, summary judgment is not a proper vehicle for resolving claims of employment discrimination which often turn on an employer's motivation and intent." *Delgado v. Lockheed–Georgia Co.,* 815 F.2d 641, 644 (11th Cir.1987); *see Jalil v. Avdel Corp.,* 873 F.2d 701, 707 (3d Cir.1989) ("When the defendant's intent has been called into question, the matter is within the sole province of the factfinder."), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990); *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988) (Summary judgment "should be used sparingly" where "the material fact at issue is an employer's intent, motivation and state of mind."). Nevertheless, "the summary judgment procedure is not *per se* improper simply because issues of motive and intent are involved." *Washington v. Lake County, Illinois,* 969 F.2d 250, 254 (7th Cir.1992); *see Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 109 (1st Cir.1988) ("Although we have advocated caution and restraint in th[e] context [of employment discrimination], we will not refuse to affirm a grant of summary judgment where it is warranted.").

B. *The 'After–Acquired Evidence' Defense and Miller's Federal Discrimination Claims*

Beneficial, as indicated, contends that, had it known of Miller's misconduct at the time it occurred, it would have terminated Miller's employment immediately. Beneficial asserts this state of facts bars Miller's right to recov-

ery and warrants dismissal of the instant action.

■ The defense asserted by Beneficial, commonly referred to as the 'after-acquired evidence' defense, was first articulated in *Summers v. State Farm Mutual Auto Insurance Co.*, 864 F.2d 700 (10th Cir.1988). There, an employee brought suit against his employer under the ADEA and Title VII, alleging he was wrongfully discharged for reasons of age and religion. *See* 864 F.2d at 702. During discovery in the ensuing action, the defendant employer "made a thorough examination of records prepared by [the plaintiff] and discovered over 150 instances where [the plaintiff] had falsified records...." *Id.* at 703. The employee did not deny having made these falsifications. *Id.*

The employer subsequently moved for summary judgment, asserting it would have fired the employee if it had known of the falsifications when they had occurred. The employer conceded that the falsifications could not have motivated the discharge since they were not known at the time of the discharge. *Id.* at 704. The employer argued, however, that the misconduct "may, and should be, considered in determining what relief, or remedy, is available to [the plaintiff]." *Id.* Specifically, the employer argued the employee was entitled to no relief. *Id.* The district court granted summary judgment in favor of the employer and the employee appealed.

On appeal, the Tenth Circuit affirmed the district court's grant of summary judgment based on the after-acquired evidence of the employee's misconduct. After reviewing the history of mixed-motive cases, the Circuit assumed for the purposes of the motion that the employer had violated Title VII and the ADEA. The Circuit reasoned, however, that the employee's misconduct invalidated any claim to damages from the date of the misconduct forward:

> [I]t is *assumed* that [the employer] was motivated, at least in part, if not substantially, because of [the plaintiff's] age and religion.... [However], while [the] after-acquired evidence [of misconduct] cannot be said to have been a "cause" for [the plaintiff's] discharge ..., it is relevant to

[the plaintiff's] claim of "injury," and does itself preclude the grant of any present relief or remedy to [the plaintiff].

*Id.* at 708 (emphasis in original).

The Circuit explained that allowing the plaintiff to recover under the circumstances would be akin to providing economic relief to a plaintiff who had no protectable economic interest in his job:

> The present case is akin to the hypothetical wherein a company doctor is fired because of his age, race, religion, and sex and the company, in defending a civil rights action, thereafter discovers that the discharged employee was not a "doctor." In our view, the masquerading doctor would be entitled to no relief....

*Id.*

The Third Circuit has not yet addressed the defense of after-acquired evidence. Other circuits and numerous district courts, however, have adopted the defense to bar or limit claims for back pay brought under Title VII and/or the ADEA. *See, e.g., O'Driscoll v. Hercules, Inc.*, 12 F.3d 176, 180 (10th Cir. 1994) (relying on after-acquired evidence to affirm summary judgment to defendant in action under Title VII and ADEA); *McKennon v. Nashville Banner Publishing Co.*, 9 F.3d 539, 543 (6th Cir.1993) (same; ADEA), *cert. granted,* —— U.S. ——, 114 S.Ct. 2099, 128 L.Ed.2d 661 (1994); *Kristufek v. Hussmann Foodservice Co.*, 985 F.2d 364, 369 (7th Cir.1993) (considering after-acquired evidence to limit damages in action under ADEA); *Russell v. Microdyne Corp.*, 830 F.Supp. 305, 307 (E.D.Va.1993) (Title VII); *Mackey v. Board of Pensions of United Methodist Church,* No. 91–C–5739, 1993 WL 11674 at *2, 1993 U.S.Dist.LEXIS 424 at *5 (N.D.Ill. 15 Jan. 1993) (Title VII); *Redd v. Fisher Controls,* 814 F.Supp. 547, 552 (W.D.Tex.1992) (Title VII and ADEA); *O'Day v. McDonnell Douglas Helicopter Co.,* 784 F.Supp. 1466, 1469 (D.Ariz.1992) (ADEA). *But see Wallace v. Dunn Construction Co.,* 968 F.2d 1174, 1179 (11th Cir. 1992) (rejecting after-acquired evidence doctrine).

In addition, at least two other circuits have indicated a willingness to consider after-ac-

quired evidence in limiting recovery in discrimination actions. *See Smallwood v. United Air Lines, Inc.,* 728 F.2d 614, 707 (4th Cir.) (directing entry of judgment for employer in ADEA refusal-to-hire case because of after-acquired evidence that plaintiff was unqualified for employment), *cert. denied,* 469 U.S. 832, 105 S.Ct. 120, 83 L.Ed.2d 62 (1984); *Murnane v. American Airlines Inc.,* 667 F.2d 98, 102 (D.C.Cir.1981) ("Even assuming, arguendo, that the company's failure to consider the applications was discriminatory, the company was entitled to prove at trial that the [plaintiffs] had not been injured because they were not qualified and would not have been hired in any event."), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1770, 72 L.Ed.2d 174 (1982).

Courts have, moreover, applied the doctrine of after-acquired evidence under facts substantially similar to those at bar. For example, employees' claims of discriminatory refusal to promote have been barred by after-acquired evidence of their misconduct. *See Russell,* 830 F.Supp. at 308; *O'Day,* 784 F.Supp. at 1467.

Also relevant to the facts at bar, most cases employing the after-acquired evidence defense have done so where the defense is based on after-acquired evidence of resume or job application fraud. Particularly apposite is the decision in *O'Driscoll,* 12 F.3d 176, where an employee sued her former employer for wrongful termination in violation of the ADEA. While preparing for trial, the employer discovered evidence of several misrepresentations on the plaintiff's employment application materials:

(1) on her employment application, [p]laintiff misrepresented her age so as to appear five years younger, falsely represented that she had never previously applied for employment with [the defendant], and failed to disclose a previous employer; (2) on her pre-employment forms, [p]laintiff misrepresented her age, date of graduation from high school, ages of her children, and falsely represented that she had completed two quarters of study at Salt Lake City Technical College; (3) on her application for membership with Blue Cross–Blue Shield of Utah, [p]laintiff misrepresented

the age of her son, who would have been otherwise ineligible for coverage as [p]laintiff's dependant.

*Id.* at 178.

On the plaintiff's employment application in *O'Driscoll,* she signed beneath the following statement:

I understand that any misrepresentation made by me herein may result in the cancellation of this employment application, withdrawal of any offer of employment or if already employed by [defendant] termination of employment without any obligation or liability to me other than payment of the rate agreed upon for services actually rendered.

*Id.*

Upon discovering these misrepresentations, the defendant moved for summary judgment, asserting it would have terminated the plaintiff if it had known of the misrepresentations. Relying on *Summers,* the district court granted summary judgment in favor of the defendant. *See O'Driscoll v. Hercules, Inc.,* 745 F.Supp. 656, 659–60 (D.Utah 1990). The district court, moreover, so held over the plaintiff's assertion that she made the misrepresentations "only because she believed [the defendant] would discriminate against her if she revealed her true age." *Id.* at 657.

On the employee's appeal, the Tenth Circuit affirmed. In so holding, the Circuit relied on *Summers* and the conclusion that the plaintiff would have been fired if the defendant had known of her misrepresentations. The Circuit rejected the plaintiff's argument that the resume fraud was not material, serious or pervasive, stating that the "[p]laintiff's repeated misrepresentations demonstrated a pattern of dishonesty and disregard for the truth." 12 F.3d at 180. The Circuit concluded:

In light of the seriousness of these misrepresentations, the sheer number of misrepresentations indicating [p]laintiff's general disregard for the truth, the sensitivity of her position with [the defendant] ..., and [the defendant's] reservation of the right to discharge any employee making a misrepresentation on an employment applica-

tion, we conclude that [p]laintiff's misconduct would have justified her termination.

*Id.*

Also instructive is the decision reached in *Rich v. Westland Printers, Inc.*, No. 92–2475, 1993 WL 220453 (D.Md. 9 June 1993). There, a plaintiff sued her employer under Title VII for "discrimination in the terms and conditions of her employment (specifically promotion and training practices)." *Id.* at *1. During discovery, the defendant uncovered evidence that the plaintiff had falsely represented her educational qualifications on her resume. *Id.* at *4. Relying on *Summers* and its progeny, the defendant subsequently moved for summary judgment.

■ In opposing the motion, the plaintiff argued "that her misrepresentation should be disregarded because it was not a qualification necessary to her position at [the defendant]." *Id.* at *6. The court rejected this argument, stating:

> The relevance of the fraud to the instant action stems from the fact that the plaintiff wilfully and knowingly misrepresented information to the defendant and that if the defendant had known that [the plaintiff] had committed a fraud, the plaintiff would have been terminated.

*Id.* Accordingly, the court granted summary judgment to the defendant, adopting the rule enunciated in *Summers*.[22] *Id.*

Other courts have barred relief to discrimination plaintiffs where the employer discovers during litigation that the employee was removing files or documents from the office. For example, in *McKennon*, 9 F.3d 539, an employee brought an action under the ADEA alleging unlawful discharge. While deposing the plaintiff, the defendant learned she had, while employed, copied and removed from the employer's premises several confidential documents to which she had access in her professional capacity. *See id.* at 540. The plaintiff asserted "she copied the documents in an attempt to learn information regarding [her] job security concerns and for her insurance and protection." *Id.* Upon gaining this information, the defendant moved for summary judgment, relying on *Summers*. The district court concluded summary judgment was warranted because the plaintiff did not suffer injury from the alleged discriminatory discharge. *See McKennon v. Nashville Banner Publishing Co.*, 797 F.Supp. 604, 608 (M.D.Tenn.1992).

On appeal, the Sixth Circuit affirmed. The Circuit applied *Summers* and found that the defendant had established beyond a genuine issue of material fact that it would have fired the plaintiff had it known of the misconduct

---

**22.** Several other courts have barred recovery by a plaintiff because of misrepresentations in employment application materials. *See, e.g., Johnson v. Honeywell Information Systems, Inc.*, 955 F.2d 409, 411 (6th Cir.1992) (barring recovery where plaintiff had made misrepresentations involving her education on her employment application); *Russell*, 830 F.Supp. at 307 (misrepresentations regarding employment history); *Redd*, 814 F.Supp. at 550 (misrepresentations regarding criminal history); *Bonger v. American Water Works*, 789 F.Supp. 1102, 1104 (D.Colo.1992) (misrepresentations regarding education); *Grzenia v. Interspec, Inc.*, No. 91–C–290, 1991 WL 222105 at *1, 1991 U.S.Dist.LEXIS 15093 at *3 (N.D.Ill. 21 Oct. 1991) (misrepresentations regarding employment history).

Resume fraud asserted in support of an after-acquired evidence defense "must be material, directly related to measuring a candidate for employment, and [must have been] relied upon by the employer in making the hiring decision." *Johnson*, 955 F.2d at 414; *see Churchman v. Pinkerton's Inc.*, 756 F.Supp. 515, 520 (D.Kan. 1991). The Sixth Circuit has explained:

> These requirements are necessary to prevent an employer from combing a discharged employee's record for evidence of any and all misrepresentations, no matter how minor or trivial, in an effort to avoid legal responsibility for an otherwise impermissible discharge.

*Johnson*, 955 F.2d at 414.

Miller's misrepresentations, if proven to be intentional, would certainly fulfill this standard. As an attorney, and an applicant for a job as an attorney, Miller was required and expected to maintain the highest standard of veracity and integrity. The Rules of Professional Conduct, in fact, make it "professional misconduct for a lawyer to [*inter alia*] engage in conduct involving dishonesty, fraud, deceit or misrepresentation." RPC 8.4(c). Miller herself concedes that an attorney must have integrity and that she would not hire an attorney knowing the attorney was dishonest. 20 Nov. 1993 Miller Dep. at 59. Under these facts, and in light of Miller's position as an attorney, her intentional misrepresentations would, as a matter of law, fulfill the materiality requirement. *See Johnson*, 955 F.2d at 414.

when it occurred. *McKennon,* 9 F.3d at 543; *see also Bonger,* 789 F.Supp. at 1104 (granting summary judgment to defendant where "plaintiff had taken either copies or the originals of nearly three thousand pages of ... confidential personnel files and turned them over to her attorney"); *O'Day,* 784 F.Supp. at 1468 (granting summary judgment to defendant based on after-acquired evidence that plaintiff "removed and copied his entire confidential personnel file" and other "personal/sensitive" personnel files in order to prepare discrimination action); *see also Mackey,* 1993 WL 11674 at *1, 1993 U.S.Dist.LEXIS 424 at *2 (applying after-acquired evidence defense based on allegations of plaintiff's "retention, copying and dissemination" of confidential personnel documents; denying summary judgment based on existence of genuine issue of material fact).

Miller asserts the after-acquired evidence defense runs contrary to the framework established by the Supreme Court for determining liability in discrimination actions. Miller Reply at 3. In *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), the Supreme Court pronounced the standard to be applied in determining liability in a 'mixed-motive' case—*i.e.,* a case where an employment decision was motivated in part by discriminatory reasons and in part by legitimate reasons. The Court stated that an employer may avoid liability if it can establish "that its legitimate reason, standing alone, would have induced it to make the same decision." *Id.* at 252, 109 S.Ct. at 1791. In reaching this standard, the Court cautioned: "An employer may not ... prevail in a mixed-motive case by offering a legitimate and sufficient reason for its decision if that reason did not motivate it at the time of decision." *Id.*

Contrary to Miller's assertion, the after-acquired evidence defense, as it has been cast by *Summers* and its progeny, does not run contrary to the Court's holding in *Hopkins.* The decision in *Hopkins* addressed liability under Title VII. Ultimately, the after-acquired evidence defense speaks not to liability, but to *damages;* liability under the Federal discrimination laws, in that the defendant was motivated by impermissible fac-

tors, has been assumed under the doctrine of after-acquired evidence. *See Summers,* 864 F.2d at 708 (assuming defendant was motivated by plaintiff's age and religion but finding after-acquired evidence relevant to "claim of injury").

A decision aptly delineating the distinction between the after-acquired evidence defense, as expressed in *Summers,* and the liability standard enunciated in *Hopkins* is *Punahele v. United Air Lines, Inc.,* 756 F.Supp. 487 (D.Colo.1991). There, the plaintiff brought suit against an employer alleging discriminatory refusal to hire in violation of the ADEA. After discovering evidence of application fraud, the employer moved for summary judgment based on *Summers.* Opposing the motion, the plaintiff argued, as Miller argues here, that the application of the after-acquired evidence defense was barred by the Supreme Court's decision in *Hopkins.*

The court rejected this argument, explaining:

[The plaintiff] misconstrues the holding in *Hopkins,* as relating to the *relief* to which a victim of forbidden discrimination in employment is entitled. *Hopkins,* however, dealt solely with the elements that constitute *liability* for forbidden employment discrimination....

This does not address the issue faced in *Summers* of whether [the plaintiff] was *injured* by the unlawful discrimination. In *Summers,* the Tenth Circuit assumed that [the defendant's] motive in discharging the plaintiff[ ] was illegal.... I am concerned with the appropriate remedy, rather than the cause of [the defendant's] employment decision....

756 F.Supp. at 490 (emphasis in original); *see O'Day,* 784 F.Supp. at 1469 ("[T]he district court in *Punahele* correctly clarified that *Hopkins* dealt solely with the elements that constitute *liability* for unlawful employment discrimination. The issue faced in *Summers* and the present case deals with whether the or not the plaintiff was *injured* by the unlawful discrimination. As in *Summers* and *Punahele,* liability is not at issue." (emphasis in original)).

Other courts have similarly held that the after-acquired evidence defense operates to negate relief, not liability. *See Kristufek,* 985 F.2d at 369 (reversing district court's judgment notwithstanding verdict based on finding of no liability due to after-acquired evidence, but remanding matter for downward modification of damage award); *Dotson v. United States Postal Service,* 977 F.2d 976, 978 (6th Cir.) ("The post termination evidence of plaintiff's application fraud is relevant to his claim of injury...."), *cert. denied,* —— U.S. ——, 113 S.Ct. 263, 121 L.Ed.2d 193 (1992); *Moodie v. Federal Reserve Bank of New York,* 831 F.Supp. 333, 336 (S.D.N.Y.1993) ("[E]ven if [plaintiff] should ultimately be found to have committed resume fraud in applying for his job with the [defendant], that finding will not bar [plaintiff] from pressing his claim of discriminatory discharge; but it presumably would affect the determination of what damages, if any, [the plaintiff] is entitled to if he prevails in his claim of discrimination."); *Mackey,* 1993 WL 11674 at *2, 1993 U.S.Dist.LEXIS 424 at *7 ("Courts have found that after-acquired evidence is relevant in determining whether employees have been damaged by alleged discriminatory terminations."); *Churchman,* 756 F.Supp. at 519–20 ("[A]fter-acquired evidence of resume fraud is not relevant under the [liability] scheme but could be highly relevant as to the availability of relief."). Under these interpretations of the after-acquired evidence defense, there is no tension between the defense and the Supreme Court's holding as to Title VII liability in *Hopkins.*

■ The after-acquired evidence defense is an appropriate balancing of the equitable considerations underlying Federal discrimi-

nation law. "The Supreme Court has held that back pay [under the Federal discrimination laws] is most accurately characterized as equitable in nature." *Tyree v. Riley,* 783 F.Supp. 877, 880 (D.N.J.1992); *see Landgraf v. USI Film Products,* —— U.S. ——, ——, 114 S.Ct. 1483, 1490, 128 L.Ed.2d 229 (1994) (Back pay under Title VII is an equitable remedy.); *Chauffeurs, Teamsters and Helpers Local No. 391 v. Terry,* 494 U.S. 558, 571, 110 S.Ct. 1339, 1348, 108 L.Ed.2d 519 (1990) ("[T]his court has labeled back pay under Title VII ... as equitable."); *Lorillard v. Pons,* 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1977) (same); *Espinueva v. Garrett,* 895 F.2d 1164, 1165 (7th Cir.) ("Neither Title VII nor the ADEA authorizes awards of compensatory or punitive damages, as opposed to 'equitable' relief such as reinstatement and back pay."), *cert. denied,* 497 U.S. 1005, 110 S.Ct. 3241, 111 L.Ed.2d 751 (1990); *Neibauer v. Philadelphia College of Pharmacy and Science,* No. 92–1993, 1992 WL 151321 at *7 (E.D.Pa. 19 June 1992) (same).[23]

Courts have long adhered to the maxim: "[H]e who seeks equity must do equity." *Manufacturer's Finance Co. v. McKey,* 294 U.S. 442, 449, 55 S.Ct. 444, 447, 79 L.Ed. 982 (1935). One court has explained this equitable doctrine of "unclean hands" as follows:

> [W]henever a party who seeks to set the judicial machinery in motion and obtain some equitable remedy has violated conscience or good faith, or other equitable principle in his prior conduct with reference to the subject in issue, the doors of equity will be shut against him [or her] notwithstanding the defendant's conduct has been such that in the absence of the

---

**23.** One court has stated, in a different context, that "a back pay award given under the ADEA is a legal remedy" and not an equitable one. *Sailor v. Hubbell, Inc.,* 4 F.3d 323, 325–26 (4th Cir. 1993). In the instant context, however, there appears no reason to treat back pay awards under the ADEA differently from those under Title VII. This is especially so because the equitable purpose of back pay, to make the victim of discrimination whole, is the same under both statutes. *Compare Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975) ("[T]he purpose of Title VII [is] to make persons whole for injuries suffered

on account of unlawful employment discrimination.") *with Rodriguez v. Taylor,* 569 F.2d 1231, 1238 (3d Cir.1977) (The make whole purpose of back pay awards in Title VII suits "is equally compelling in the context of ADEA actions."), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978); *cf. Terry,* 494 U.S. at 570, 110 S.Ct. at 1347 ("[W]e have characterized damages as equitable where they are restitutionary...."). As discussed below, the after-acquired evidence defense serves this equitable purpose equally in the ADEA context and in the Title VII context.

circumstances supporting the maxim, equity might have awarded relief.

General Development Corp. v. Binstein, 743 F.Supp. 1115, 1134 (D.N.J.1990); see DeWeese v. Reinhard, 165 U.S. 386, 390, 17 S.Ct. 340, 341, 41 L.Ed. 757 (1897) ("A court of equity acts only when and as conscience commands, and if the conduct of the plaintiff be offensive to the dictates of natural justice, then, whatever may be the rights he [or she] possesses and whatever use he [or she] may make of them in a court of law, he [or she] will be held remediless in a court of equity."). In order to benefit from the defense of unclean hands, the defendant must "demonstrate that the plaintiff's inequitable conduct is immediately and necessarily related to the equity that the plaintiff seeks in [the] litigation." Binstein, 743 F.Supp. at 1134; see Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 245, 54 S.Ct. 146, 147, 78 L.Ed. 293 (1933).

■■■ In the context of the doctrine of after-acquired evidence, the employee's misconduct, if it is grounds for the employee's termination, is "immediately and necessarily related to the equity that the plaintiff seeks" in a discrimination suit for back pay. Binstein, 743 F.Supp. at 1134. That equity is the wages lost as a result of unlawful discrimination. If, by virtue of the plaintiff's misconduct, the plaintiff was not entitled to those wages, equity will not grant the plaintiff the windfall of receiving those wages.[24] See id.

The after-acquired evidence defense also serves important policy objectives. It has been noted that "[t]he problem of false applications for employment is major in scope." Wallace, 968 F.2d at 1187 (Godbold, J., dissenting) (collecting authorities). As one court explained, ignoring after-acquired evidence of resume fraud

> would not only encourage but would serve as an incentive to every person seeking employment to falsify his application, to deceive and mislead the prospective employer in every possible way in order to gain employment.

Jordan v. Johnson Controls, Inc., —— S.W.2d ——, ——, (Tex.App. 5th Dist. 23 Feb. 1994).

The instant facts, involving as they do other types of employee misconduct in addition to resume fraud, provide a particularly compelling argument for the application of the after-acquired evidence defense. Here, as stated, in addition to resume and application fraud, Miller is alleged to have removed confidential files from Beneficial's offices in order to prepare for impending litigation against Beneficial. Title VII and the other Federal anti-discrimination statutes were never intended to condone, or provide an incentive for, the misappropriation of confi-

---

**24.** Beneficial does not specifically address whether the after-acquired evidence defense would bar Miller's requests for punitive damages and compensatory relief for pain and suffering. This issue, however, need not be addressed with respect to Miller's Federal claims. It has consistently been held that, with respect to claims arising before 1991, neither Title VII nor the ADEA allows a plaintiff to recover compensatory or punitive damages. See Protos v. Volkswagen of America, 797 F.2d 129, 137 (3d Cir.) (Neither compensatory nor punitive damages are available under Title VII), cert. denied, 479 U.S. 972, 107 S.Ct. 474, 93 L.Ed.2d 418 (1986); Rogers v. Exxon Research & Engineering Co., 550 F.2d 834, 841–42 (3d Cir.1977) (Damages for pain and suffering are not available under ADEA), cert. denied, 434 U.S. 1022, 98 S.Ct. 749, 54 L.Ed.2d 770 (1978); Harter v. GAF Corp., 150 F.R.D. 502, 509 n. 9 (D.N.J.1993) ("Under the ADEA, ... a party can only recover damages in the form of lost earnings."); Wagner v. Sperry Univac, 458 F.Supp. 505, 518 (E.D.Pa.1978) (Punitive damages are not available under ADEA.), aff'd, 624 F.2d 1092 (3d Cir.1980). The same has been held with respect to the EPA. See Neibauer, 1992 WL 151321 at *7.

The Civil Rights Act of 1991 (the "1991 Amendments") provides a Title VII plaintiff with the right to recover compensatory and/or punitive damages. See 42 U.S.C. § 1981a. The Supreme Court has recently held, however, that the 1991 Amendments may not be applied retroactively. See Landgraf, —— U.S. at ——, 114 S.Ct. at 1488; see also Tyree, 783 F.Supp. at 892; cf. Rivers v. Roadway Express, Inc., —— U.S. ——, ——, 114 S.Ct. 1510, 1514, 128 L.Ed.2d 274 (1994) (citing Landgraf in holding that section 101 of the 1991 Amendments, regarding the right to make and enforce contracts, apply prospectively only). Because the claims at bar arose before the 1991 Amendments were enacted, the provision for compensatory and punitive damages stated therein is inapplicable to the instant case. Id.

dential information in the possession of the employer.[25]

■ The doctrine of after-acquired evidence is not without its limitations. As indicated, an employer may not rely on every minor instance of misconduct to invoke the defense. *See Johnson*, 955 F.2d at 414 (providing materiality requirement for resume fraud cases). Also, the employer "must prove that, had it known of [the employee's] misconduct, it would have terminated her employment." *McKennon*, 797 F.Supp. at 608; *see McKennon*, 9 F.3d at 543; *Washington*, 969 F.2d at 256; *O'Day*, 784 F.Supp. at 1468; *see also Malone v. Signal Processing Technologies*, 826 F.Supp. 370, 375 (D.Colo.1993) ("[T]he employer bears the burden of demonstrating that had it known about the misconduct it would have terminated the employee."); *Bonger*, 789 F.Supp. at 1106 (same).

The employer does not carry this burden by proving simply that it *could* have fired the employee for the misconduct; the employer must establish it *would* have terminated the employee. *See Reed v. Amax Coal Co.*, 971 F.2d 1295, 1298 (7th Cir.1992) ("*Summers* and analogous cases require proof that the employer would have fired the employee, not simply that it could have fired him."); *Mackey*, 1993 WL 11674 at *3, 1993 U.S.Dist.LEXIS 424 at *9, (same).

"The issue of whether an employer would actually fire an employee could generate a genuine issue of material fact in some cases." *McKennon*, 9 F.3d at 543; *see O'Day*, 784 F.Supp. at 1469 (same); *see also Mackey*, 1993 WL 11674 at *3, 1993 U.S.Dist.LEXIS 424 at *9 (denying summary judgment where plaintiff created genuine issue as to whether the defendant would have fired plaintiff had it known of removal of documents); *Puna-*

*hele*, 756 F.Supp. at 491 (same). This is particularly so where an employer knew of an employee's misconduct prior to litigation and did not take action against the employee.

In *DeVoe v. Medi–Dyn, Inc.*, 782 F.Supp. 546 (D.Kan.1992), the court was presented with a claim alleging discriminatory discharge in violation of Title VII. The employer subsequently moved for summary judgment based on after-acquired evidence of certain misrepresentations made by the plaintiff during the application process. *See id.* at 551.

The court noted evidence indicating the employer knew of the misrepresentations prior to the institution of litigation. Based upon this evidence, the court denied summary judgment on the after-acquired evidence defense:

> Based on the evidence before it, the [c]ourt cannot say as a matter of law that the defendant would have made the same employment decisions in plaintiff's case if it had been aware of the alleged misrepresentations. Indeed, the action actually taken by defendant belies its assertion that plaintiff was "unqualified" for employment. When [the defendant] learned of plaintiff's [misrepresentations], [defendant] did not dismiss plaintiff, or even intimate that it was considering dismissal for his failure to disclose the ... information.

*Id.* at 552; *see Bonger*, 789 F.Supp. at 1107 n. 7 (granting summary judgment on after-acquired evidence defense, but noting that "if [defendants] did know that the plaintiff had these records and had shown them to her attorney, [the facts] would indicate that the defendants are now engaging in a *post hoc* rationalization for their conduct."); *see also Malone*, 826 F.Supp. at 376 (denying summary judgment where employer, knowing of

---

**25.** It is recognized that Title VII serves purposes other than equity. For example, the Supreme Court has stated Title VII was intended "to achieve equality of employment opportunity" by giving employers incentives "to self-examine and self-evaluate their employment practices and to endeavor to eliminate, so far as possible," employment discrimination. *Albemarle Paper Co.*, 422 U.S. at 417–18, 95 S.Ct. at 2371–72 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 429–30, 91 S.Ct. 849, 852–53, 28 L.Ed.2d 158 (1971)).

This deterrent purpose, however, is not so closely related to the remedy of back pay as is Title VII's equitable purpose of making the discrimination victim whole. *See Albemarle Paper Co.*, 422 U.S. at 418, 95 S.Ct. at 2372. The latter consideration, as stated, is well-served by the doctrine of after-acquired evidence. The equally important purpose of deterring and punishing discrimination is better-served by Title VII's provision for punitive damages. As indicated, that provision is not at issue here. *See supra* note 24.

misconduct, stated "she is unaware of any reason why [defendant] could not rehire [plaintiff] into an available position").

▮ In summary, in order to bar Miller's claims for back pay under Title VII, the ADEA and the EPA,[26] Beneficial must establish, beyond a genuine issue of material fact, that: (1) Miller engaged in the misconduct alleged in the Seventh Affirmative Defense and the Eighth Affirmative Defense; and (2) Beneficial would have terminated Miller had it known of this misconduct at the time it occurred.

### C. *Miller's Claims under the NJLAD*

▮ In deciding substantive questions of state law, a Federal court is, of course, bound by the decision of the state's highest court. *See Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); *Danfield v. Johns–Manville Sales Corp.,* 829 F.2d 1233, 1237 (3d Cir.1987). The New Jersey Supreme Court has not yet addressed whether after-acquired evidence of employee misconduct may bar recovery under the NJLAD. New Jersey courts, however, generally look to Federal discrimination law in interpreting the NJLAD. *See Grigoletti v. Ortho Pharmaceutical Corp.,* 118 N.J. 89, 110, 570 A.2d 903 (1990); *Peper v. Princeton University Board of Trustees,* 77 N.J. 55, 81, 389 A.2d 465 (1978); *Giammario v. Trenton Board of Education,* 203 N.J.Super. 356, 361, 497 A.2d 199 (App.Div.) (Age discrimination claim under the NJLAD is to be evaluated in accordance with precedents interpreting Title VII and the ADEA.), *certif. denied,* 102 N.J. 336, 508 A.2d 212 (1985), *cert. denied,* 475 U.S. 1141, 106 S.Ct. 1791, 90 L.Ed.2d 337 (1986).

▮ Such an approach is counseled by the similarity in the nature of remedies under Title VII and the NJLAD. Back pay under the NJLAD, like back pay under Title VII, is among the "equitable damages" available to the aggrieved. *Lehmann v. Toys 'R' Us, Inc.,* 132 N.J. 587, 617, 626 A.2d 445 (1993); *see Landgraf,* —— U.S. at ——, 114 S.Ct. at 1490 (Back pay under Title VII is an equitable remedy.). In light of these factors, it appears the New Jersey Supreme Court would apply the after-acquired evidence defense to limit back pay recovery under the NJLAD to the same extent that the defense is applied under Federal discrimination law. This approach, accordingly, will be adopted in the instant case.

▮ The NJLAD, however, provides broader remedies than back pay. The New Jersey legislature has provided for punitive damages and compensatory damages for pain and suffering in actions under the NJLAD:

> The Legislature ... finds that because of discrimination, people suffer personal hardships, and the state suffers a grievous harm. The personal hardships include: ... physical and emotional distress; and in some cases severe emotional trauma, illness ...; and adjustment problems, which particularly impact on those protected by

---

26. Miller argues the after-acquired evidence defense should not be applied to bar her claims under the EPA, citing *Boyd v. Rubbermaid Commercial Products, Inc.,* 1992 WL 404398, 1992 U.S.Dist. LEXIS 20455 (W.D.Va. 11 Dec. 1992). There, the court declined to apply the after-acquired evidence defense to bar an EPA claim on the ground that "Congress has set out two distinct statutory schemes in Title VII and the Equal Pay Act." *Id.,* 1992 WL 404398 at *5, at *15.

The statutory scheme set out in the EPA is distinct from that set out in Title VII. However, the purpose of back pay under the EPA is identical to the purpose of back pay under Title VII. *See Reeves v. International Telephone and Telegraph Corp.,* 616 F.2d 1342, 1353 (5th Cir.1980) (purpose of back pay under EPA is to "reasonably restore the employee to the same situation he would have occupied if he had not been discharged"), *cert. denied,* 449 U.S. 1077, 101 S.Ct. 857, 66 L.Ed.2d 800 (1981); *see also Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687, 66 S.Ct. 1187, 1192, 90 L.Ed. 1515 (1946) (An EPA plaintiff bears the initial burden of establishing that he or she performed work for which he or she was not compensated); *Dole v. Tony and Susan Alamo Foundation,* 915 F.2d 349, 351 (8th Cir.1990) (same). As indicated, the after-acquired evidence defense is suited to the equitable purposes of back pay under Title VII. Accordingly, there is no logical reason that the after-acquired evidence doctrine should not apply with equal force to claims under the EPA. Indeed, courts have applied the after-acquired evidence defense to claims under the ADEA, an act which also presents a statutory framework distinct from Title VII. *See O'Driscoll,* 12 F.3d at 180; *McKennon,* 9 F.3d at 543; *Kristufek,* 985 F.2d at 369.

this act. *Such harms have, under the common law, given rise to legal remedies, including compensatory and punitive damages. The legislature intends that such damages be available to all persons protected by this act* and that this act shall be liberally construed in combination with other protections available under the laws of this state.[27]

N.J.S.A. § 10:5–3 (emphasis added). This statute recognizes the noneconomic nature of many of the injuries sustained by NJLAD plaintiffs. *See Montells v. Haynes,* 133 N.J. 282, 292, 627 A.2d 654 (1993) (noting similar injuries cognizable under NJLAD and concluding: "The statute strikes directly at conduct that injures the personhood of another. A discrimination claim cuts most deeply at the personal level.").

New Jersey courts have accordingly recognized the availability of compensatory and punitive relief under the NJLAD. *See Lehmann,* 132 N.J. at 617, 626 A.2d 445 (recognizing right to both compensatory and punitive damages under NJLAD); *Catalane v. Gilian Instrument Corp.,* 271 N.J.Super. 476, 499, 638 A.2d 1341 (App.Div.1994) (recognizing right to compensatory damages for emotional distress in age discrimination claim under NJLAD); *Wilson v. Parisi,* 268 N.J.Super. 213, 219, 633 A.2d 113 (App.Div. 1993) (recognizing plaintiff's right to punitive damages under NJLAD). Moreover, the New Jersey Supreme Court has recognized

compensatory and punitive damages under the NJLAD to be legal remedies, distinct from equitable relief such as back pay. *See Lehmann,* 132 N.J. at 617, 626 A.2d 445; *see also* N.J.S.A. § 10:5–3. The New Jersey Supreme Court has noted, therefore, that "different considerations apply to determine the proper standards of employer liability for compensatory and punitive damages." *Lehmann,* 132 N.J. at 617, 626 A.2d 445. As such, the equitable rationale which requires the application of the after-acquired evidence defense to limit back pay under the NJLAD cannot require application of the defense to limit punitive and emotional suffering damage awards.

 Back pay protects the discrimination plaintiff's economic interest in a job. It is this economic interest which is vitiated by after-acquired evidence of an employee's misconduct. Accordingly, the availability of back pay is properly limited by the doctrine of after-acquired evidence. Employee misconduct, however, does not vitiate the employee's right to be free from racial or ethnic indignity, a right compensable under the NJLAD. *See* N.J.S.A. § 10:5–3; *Montells,* 133 N.J. at 292, 627 A.2d 654 (The NJLAD "strikes directly at conduct that injures the personhood of another."). Nor does the employee's misconduct diminish the psychological and emotional injury caused to the employee by the employer's violation of this right.[28] *Cf. Summers,* 864 F.2d at 708 (find-

---

**27.** The language in the NJLAD regarding the availability of emotional distress and punitive damages was enacted in 1990. *See* L.1990, c. 12 § 1. With respect to this language, the New Jersey Legislature provided: "This act shall take effect immediately and shall apply to any action pending on that date [16 April 1990]." L.1990, c. 12 § 5. Accordingly, it appears the NJLAD's provision for emotional distress and punitive damages is applicable to Miller's claims under the NJLAD. *Id.; see Lehmann,* 132 N.J. at 626, 626 A.2d 445 (applying emotional distress and punitive damage amendments to action filed in 1987); *T.L. v. Toys 'R' Us, Inc.,* 255 N.J.Super. 616, 643, 605 A.2d 1125 (App.Div.) (same), *certif. denied,* 130 N.J. 19, 611 A.2d 657 (1992), *aff'd and modified in part on other grounds,* 132 N.J. 587, 626 A.2d 445 (1993). In any event, compensatory damages for emotional distress and punitive damages were available under the NJLAD before the 1990 amendments to the NJLAD were enacted. *See Levinson v. Prentice–Hall, Inc.,* 868 F.2d 558, 563 (3d Cir.1989) (puni-

tive damages are available under NJLAD); *Lehmann,* 132 N.J. at 616, 626 A.2d 445 (noting that damages for emotional distress were available prior to 1990 amendments to NJLAD).

**28.** As indicated, the doctrine of after-acquired evidence is consistent with the equitable doctrine of "unclean hands." *See supra* at 713. In order to invoke the defense of unclean hands, the defendant must "not only demonstrate the plaintiff's inequitable conduct, but also ... demonstrate that the plaintiff's inequitable conduct is *immediately and necessarily related to the equity* that the plaintiff seeks in [the] litigation." *Binstein,* 743 F.Supp. at 1134; *see Keystone Co.,* 290 U.S. at 245, 54 S.Ct. at 147. In the context of after-acquired evidence, employee misconduct is not "immediately and necessarily related" to the victim's right to damages for emotional distress. The injuries compensated by these damages, as stated, are personal in nature and are distinct from the economic injuries negated by employee

ing after-acquired evidence relevant to "claim of injury").[29] There appears to be no principled basis, therefore, for the application of the after-acquired evidence defense in this case to bar compensatory relief for emotional suffering under the NJLAD.[30]

■ Similarly, an employee's misconduct does not negate the necessity of punitive damages where such damages are appropriate under the NJLAD. Punitive damages under the NJLAD are directed toward deterring and punishing discriminatory employment decisions by employers. *See* N.J.S.A. § 10:5–3; *see Lehmann*, 132 N.J. at 626, 626 A.2d 445 (Punitive damages under NJLAD are intended to "provid[e] employers with incentive . . . to provide voluntary compliance programs . . . to ensure that hostile work environment discrimination claims disappear from the workplace. . . .").

Punitive damages are not concerned with the employee's equitable interest in his or her job; nor are they concerned with any injury the plaintiff may have suffered. *See T.L.*, 255 N.J.Super. at 642, 605 A.2d 1125 (Despite absence of injury to plaintiff, "the wanton disregard of plaintiff's personal rights and sensitivities alleged would, if believed, be sufficient to permit the award of exemplary damages."). Rather, they are directed exclusively toward an employer's discriminatory animus.[31] *See Lehmann*, 132 N.J. at 624, 626 A.2d 445 ("Punitive damages [under the NJLAD] are to be awarded when the wrongdoer's conduct is especially egregious."); *Leimgruber v. Claridge Associates*, 73 N.J. 450, 454, 375 A.2d 652 (1977) (same).

■ The employer's allegedly discriminatory state of mind is unaltered by after-acquired evidence of an employee's misconduct. In granting summary judgment to the employer, the decisions in *Summers* and it progeny assumed the employer had made an employment decision motivated by discriminatory animus and that the employee miscon-

misconduct. Accordingly, equitable principles do not justify limiting damages for emotional distress under the NJLAD because of after-acquired evidence of employee misconduct. *See Binstein*, 743 F.Supp. at 1134.

As well, equitable defenses, such as the unclean hands defense, are generally not applicable to bar claims seeking legal remedies. *See Binstein*, 743 F.Supp. at 1133–34; *Dunkin Donuts of America, Inc. v. Middletown Donut Corp.*, 100 N.J. 166, 184, 495 A.2d 66 (1985); *Merchants Indem. Corp. v. Eggleston*, 37 N.J. 114, 132, 179 A.2d 505 (1962) (doctrine of unclean hands "operates to deny a suitor the special remedies of equity, leaving him his remedies at law."). As indicated, compensatory and punitive damages under the NJLAD are defined as legal remedies, distinct from the equitable remedy of back pay. *See* N.J.S.A. § 10:5–3; *Lehmann*, 132 N.J. at 617, 626 A.2d 445.

29. The court in *Summers* did not address the possibility of awarding compensatory damages under Title VII or the ADEA because compensatory damages were not available under those statutes. *See Summers*, 864 F.2d at 708; *see also Protos*, 797 F.2d at 137 (compensatory damages are not available under Title VII); *Harter*, 150 F.R.D. at 509 n. 9 (stating same with respect to ADEA).

30. In some instances, the employee's misconduct may be so calculated and egregious as to render incredible any assertion by the employee that he or she suffered emotional or other harm from discrimination. For example, in the "masquerading doctor" hypothetical put forth by the court

in *Summers*, 864 F.2d at 708, the doctor's conduct would have been so calculated to defraud the employer that the doctor could not viably claim to have been emotionally or otherwise injured by discriminatory treatment. That employee may himself have committed actionable conduct against the employer. In the instant motion, however, it cannot be concluded as a matter of law that Miller's conduct was so calculated and egregious as to nullify any assertions of emotional or other injury she may have. The extent to which Miller may or may not have been emotionally or otherwise damaged is jury submissible.

31. In *Lehmann*, the New Jersey Supreme Court stated the right to punitive damages under the NJLAD should be determined according to common law principles governing punitive damages generally. *See* 132 N.J. at 617, 626 A.2d 445. With regard to punitive damages generally under New Jersey law, the New Jersey Supreme Court has stated:

The key to the right to punitive damages is the wrongfulness of the intentional act. The right to award exemplary damages primarily rests upon the single ground—wrongful motive. . . .

Because of the fortuitous circumstance that an injured plaintiff failed to prove compensatory damages, the defendant should not be freed from responsibility for aggravated misconduct. People should not be able with impunity to trench wilfully upon a right.

*Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 97 N.J. 37, 49–50, 477 A.2d 1224 (1984).

duct did not enter into the discriminatory decision. *See* 864 F.2d at 708; *see also Punahele*, 756 F.Supp. at 490; *O'Day*, 784 F.Supp. at 1469. These decisions bar relief to the plaintiff based on the absence of any injury to the plaintiff, not based on absence of discriminatory animus on the part of the defendant.[32] *See Summers*, 864 F.2d at 708; *Punahele*, 756 F.Supp. at 490. The awarding of punitive damages under the NJLAD, as indicated, depends not upon a finding of injury to the plaintiff, but upon a finding of wanton discriminatory animus on the part of the defendant.[33] *See Lehmann*, 132 N.J. at 624, 626 A.2d 445. After-acquired evidence of misconduct, therefore, does not invalidate the concerns and interests addressed by punitive damages under the NJLAD and should not be applied to bar such damages.

### D. *Beneficial's Motion for Summary Judgment*

As indicated, in order to prevail in its motion for summary judgment, thereby barring Miller's claims for back pay under the NJLAD, ADEA, EPA and Title VII, Benefi-

cial must prove, beyond a genuine issue of material fact that: (1) Miller engaged in the misconduct alleged in the Seventh Affirmative Defense and the Eighth Affirmative Defense; and (2) Beneficial would have terminated Miller had it known of this misconduct at the time it occurred.

■ Based on the facts currently at bar, it cannot be concluded, as a matter of law, that Beneficial has established the elements of a defense based on after-acquired evidence. It is undisputed Miller misrepresented her age and date of high school graduation on her Employment Contract, Resume, Death Benefits Card and Health Insurance Card. *See* Miller Opp. 12G, ¶ 38; 23 Mar. 1994 Miller Cert., ¶ 6. It is also undisputed that these misrepresentations were intentional. *See* Miller Opp. 12G, ¶ 39, 41, 47.

There is no question Beneficial would have been entitled to terminate Miller for these misrepresentations. Miller acknowledged as much when she signed the Application under the statement: "I understand that any omission or misrepresentation of fact ... may result in refusal of or separation from em-

---

**32.** The court in *Summers* did not reach the issue of punitive damages under Title VII or the ADEA because punitive damages were not available under either Title VII or the ADEA. *See Summers*, 864 F.2d at 708; *see also Protos*, 797 F.2d at 137 (punitive damages are not available under Title VII); *Harter*, 150 F.R.D. at 509 n. 9 (same concerning ADEA).

**33.** Punitive statutes are commonly concerned only with the culpable conduct and state of mind of the defendant, and not with injury to a victim. If, for example, a thief attempts to rob a bank or house in which there is no money, the thief would still be held liable for attempted robbery. *See* Model Penal Code § 5.01(1)(a) (rejecting defense of impossibility with respect to inchoate crimes and holding a person guilty where he or she "purposely engages in conduct that would constitute the crime *if the attendant circumstances were as he believes them to be*" (emphasis added)). The fact that there is no injury, and could in fact be no injury, is irrelevant to the defendant's liability under punitive provisions. *Id.*, Commentary at 311 ("[T]he general rule today is that one can be guilty of an attempt to murder although the gun or poison or bomb is incapable of producing death."); *see also id.* at 318 ("When ... the defendant shoots at an empty bed, believing that his intended victim is in the bed, he engages in conduct with the purpose of causing the death of his victim ... and is thus

guilty of an attempted homicide...."). Similarly, the fact that a plaintiff in an after-acquired evidence case may suffer no injury does not alter the fact of the defendant's wanton misconduct and culpable state of mind. *See Summers*, 864 F.2d at 708 (assuming discriminatory animus, and therefore finding violation of Title VII, but finding no injury). Such lack of injury, therefore, does not affect the availability of punitive damages under the NJLAD.

This is not to suggest, however, that culpable intent is the only element necessary to a claim for punitive damages under the NJLAD. Punitive damages under the NJLAD are appropriate only "when the wrongdoer's conduct is especially egregious." *Lehmann*, 132 N.J. at 624, 626 A.2d 445; *see Leimgruber*, 73 N.J. at 454, 375 A.2d 652. Mere violation of the NJLAD is an insufficient basis on which to award punitive damages. As one court has elaborated, punitive damages are warranted only where the employer exhibits "*wanton* disregard of [a] plaintiff's personal rights and sensitivities." *T.L.*, 255 N.J.Super. at 642, 605 A.2d 1125 (emphasis added). In the absence of such egregious employer conduct, an award of punitive damages is not permitted under the NJLAD. *Id.*

Moreover, as in the case of damages for pain and suffering, an employee's misconduct may itself be so calculated and egregious as to render an award of punitive damages inappropriate. *See supra* note 30.

ployment upon discovery thereof." Application at 3. Furthermore, Miller's position as an attorney demanded of her the highest level of integrity and veracity. *See* RPC 8.4. This is particularly so in light of the sensitivity of Miller's duties in the Legal Department and Government Relations Department. *See* 1982 Job Description; 1985 Job Description. An intentional misrepresentation by one so employed is of particular significance in the employment decision, and is certainly material enough to invoke the after-acquired evidence doctrine. *See O'Driscoll,* 12 F.3d at 180 (noting "the sensitivity of [the plaintiff's] position" in applying after-acquired evidence defense).

As indicated, however, Beneficial does not carry its burden under the after-acquired evidence doctrine merely by establishing it *could* have fired Miller for the misrepresentations; Beneficial must establish it *would* have terminated Miller for the misrepresentations. *See Reed,* 971 F.2d at 1298; *see also McKennon,* 9 F.3d at 543. Any assertion by Beneficial to this effect is controverted by its actions in this case.

There is some evidence in the record that high-ranking officers of Beneficial knew, before the institution of this action, that Miller misrepresented her age and date of high school graduation on employment application materials. In September 1988, Ward, a senior vice president at Beneficial and head of the Government Relations Department, began to suspect Miller had misrepresented her age on her employment materials. *See* Beneficial Moving 12G, ¶ 31. Shortly thereafter, upon reviewing Miller's personnel records, Ward discovered Miller had in fact misrepresented her age.[34] 10 Dec. 1993 Ward Dep. at 9, 14. Also in September 1988, Cole, Beneficial's Vice President for Human Resources, discovered Miller had misrepresented her date of high school graduation in her employment materials. *See* 17 Nov. 1993 Cole Dep. at 40.

Much of this information was transmitted through Beneficial's chain of command to the highest levels of management. In the 1988 Addendum, Ward informed Cole, Schneider, a Beneficial senior vice president, and Farris, Beneficial's president, of a "misrepresentation" as to Miller's age in her employment application materials. 1988 Addendum at 2. In the 18 October 1988 Memo, Ward informed Cole, Schneider and Hance, Beneficial's General Counsel and a senior vice president, of Miller's "lying about her age on her employment application." 18 Oct. 1988 Memo. In the 17 November 1988 Memo, Maher informed Hance and Cole of the discrepancy between the date of birth represented on Miller's Health Insurance Card and that represented on her 1988 Claim. *See* 17 Nov. 1988 Memo.

In spite of these indications that the upper echelon of Beneficial knew as early as the fall of 1988 that Miller had misrepresented her age and date of high school graduation on her employment materials, Beneficial took no action to terminate Miller before she left in January 1989. Beneficial admits it "chose not to pursue the matter with [Miller] at that time...." Beneficial Moving 12G, ¶ 34.

Also significant is the fact that Beneficial, with at least some knowledge of Miller's misrepresentations, thrice offered her re-employment in January 1989. *See* 10 Jan. 1989 Letter; 13 Jan 1989 Letter; 20 Jan. 1989 Letter. These offers were made by Hance, with the knowledge of Cole and Executive Committee members Gilliam and Caspersen.[35] *See* 17 Nov. 1993 Hance Dep. at 142–43; 13 Dec. 1993 Caspersen Dep. at 52. The fact that Miller was offered re-employment despite Beneficial's knowledge of her misrepresentations as to her age and date of high school graduation creates a triable issue as to whether the misrepresentations would have caused Miller's termination. Beneficial has, therefore, failed to establish beyond a genuine issue of material fact that it would have terminated Miller had it known of the misrepresentations. *See DeVoe,* 782 F.Supp. at

---

**34.** On or about 15 November 1988, while reviewing Miller's 1988 Claim, Maher, a Beneficial vice president, discovered Miller's misrepresentation of her age on her Health Insurance Card. *See* 17 Nov. 1988 Memo.

**35.** Gilliam agreed with Hance's recommendation that Miller should be offered re-employment in January 1989. 17 Nov. 1993 Hance Dep. at 143.

552; *see also Malone*, 826 F.Supp. at 376 (denying summary judgment based on after-acquired evidence defense where "human resources manager ... stated that she is unaware of any reason why [defendant] could not rehire [plaintiff] into an available position").

■ As with respect to Miller's age misrepresentations, it is undisputed that Miller routinely removed confidential documents from Beneficial's offices without authorization. 20 Nov. Miller Dep. at 69–71. It is also undisputed that Miller revealed some of these documents to her attorney, a person not authorized by Beneficial to view company documents. *Id.* at 231, 235.

There is no question such misconduct could have resulted in Miller's termination. Many of the documents removed by Miller contained confidential information regarding Beneficial and its employees. *See* Anderson Cert., Exs. LL (Personnel Files), MM, NN (Contribution Lists). Others contained privileged communications between Beneficial and its attorneys. *See* 20 Nov. 1993 Miller Dep. at 108–118 (describing Opinion Memos). Miller not only removed these confidential communications from Beneficial's offices, but also showed them to an unauthorized third party. In light of the sensitivity of Miller's position as an attorney, it is apparent that her removal of these documents is material enough to invoke the defense of after-acquired evidence.[36] *See McKennon*, 9 F.3d at 543 (applying after-acquired evidence defense where plaintiff copied documents for her "protection"); *Bonger*, 789 F.Supp. at 1104 (applying defense where plaintiff copied documents and provided them to her attorney).

In order to bar the relief sought by Miller, however, Beneficial must show more than that the document removal was grounds for Miller's termination. Beneficial must show it would in fact have terminated Miller if it had known of the document removal when it occurred. *See Reed*, 971 F.2d at 1298; *see also McKennon*, 9 F.3d at 543. Beneficial has failed to make this showing beyond a genuine issue of material fact.

There is evidence in the record indicating that high-ranking officers within Beneficial knew of Miller's practice of removing files as early as September 1988. Ward testified that, by 3 October 1988, he knew Miller was removing files and assumed Miller was attempting to create a record for litigation. *See* 10 Dec. 1993 Ward Dep. at 33. This information had been transmitted to Cole in September 1988. 17 Nov. 1993 Cole Dep. at 33. In the 3 October 1988 Memo, Ward informed Hance, Schneider, Farris and Caulfield, the Beneficial attorney supervising the Internal Investigation, that Miller was removing files to prepare for litigation.[37] 3 Oct. 1988 Memo. On 13 December 1988, Ward informed Caspersen that Miller "ha[d] secretly been accumulating files of company documents at home." *See* 13 Dec. 1988 Memo.

There is also some indication that Beneficial knew Miller was providing these documents to an attorney. As indicated, Ward believed in September 1988 that Miller was removing files to prepare for litigation. 3 Oct. 1988 Memo; 10 Dec. 1993 Ward Dep. at 33. In October 1988, Ward transmitted this information to Hance, Schneider, Farris and Caulfield. 3 Oct. 1988 Memo. Similarly, in the Hance Phone Notes, written 20 October 1988, Hance indicated he believed Miller was removing documents in contemplation of litigation against Beneficial. *See* Hance Phone Notes.

As early as 9 September 1988, Ward and Cole knew Miller had retained an attorney in relation to this litigation. 9 Sept. 1988 Memo. During the same period, Caulfield was informed by Miller that Miller had retained an attorney. *See* 13 Dec. 1993 Caul-

---

**36.** As indicated, Miller was entrusted by Beneficial with responsibility for several sensitive areas of Beneficial's operations. *See* 1982 Job Description; 1985 Job Description. To the extent her removal of documents compromised these operations, Miller clearly breached an integral condition of the terms of her employment.

**37.** Caulfield independently learned of Miller's practice of removing files in October 1988, while conducting the Internal Investigation. 13 Dec. 1993 Caulfield Dep. at 25–27. Caulfield transmitted this information to Ward. *See* 10 Dec. 1993 Ward Dep. at 49–54.

field Dep. at 33. It appears Beneficial at least suspected Miller's attorney had access to the company documents in Miller's possession. In December 1988, as indicated, Hance expressed concern to Miller over her maintaining the confidentiality of the company documents known to be in her possession. *See* 14 Dec. 1988 Memo. In light of this evidence, there is a genuine issue of material fact as to whether Beneficial knew in the fall of 1988 that Miller was providing the documents to her attorney.

Despite this evidence as to Beneficial's knowledge of Miller's misconduct, Beneficial did not act to terminate Miller in the fall of 1988. Beneficial did not, moreover, take action to obtain the return of the documents from Miller; it merely reminded her of her obligations with respect to the attorney-client privilege. *See* 14 Dec. 1988 Memo.

Beneficial also offered Miller re-employment in January 1989, after its officers knew of her misconduct in removing files. *See* 10 Jan. 1989 Letter; 13 Jan. 1989 Letter; 20 Jan. 1989 Letter. Beneficial's failure to take action against Miller, coupled with its offer to re-employ Miller after learning of her removal of files, creates a triable issue as to whether Beneficial would have terminated Miller based on this misconduct. Accordingly, Beneficial has not established, as a matter of law, its entitlement to prevail on the after-acquired evidence defense based on Miller's removal of files. *See DeVoe,* 782 F.Supp. at 552; *see also Malone,* 826 F.Supp. at 376.

Beneficial asserts its failure to terminate Miller despite its knowledge of this misconduct should not preclude summary judgment based on the after-acquired evidence defense. Beneficial argues it could not have terminated Miller during the fall of 1988 for fear of a discrimination lawsuit. Beneficial Reply at 13. Beneficial states this is particularly so because it was investigating charges made by

Miller regarding unlawful conduct on the part of the company. Beneficial states terminating Miller during the pendency of the Internal Investigation would have been inappropriate, for such termination may have invoked a retaliatory discharge suit by Miller. Beneficial Moving Brief at 28–29.

This argument may have had some force if Beneficial had merely declined to terminate Miller upon learning of her misconduct. However, Beneficial not only declined to fire Miller, but offered to re-hire her after she left Beneficial. It does not appear Beneficial was under any obligation to offer Miller re-employment, notwithstanding any charges of unlawful conduct made by Miller.[38]

There is some evidence indicating Beneficial's offers to re-employ Miller in January 1989 were motivated by a desire on Beneficial's part to have Miller continue working there, and not by fear of a discrimination suit. In the Termination Form, Hance indicated he would re-employ Miller, explaining: "Re-employment would be to continue to provide ... Miller with the opportunity of a meaningful and productive position here." Termination Form at 1. Hance, as indicated, conveyed a similar opinion to Gilliam in January 1989; Gilliam agreed with Hance's assessment. *See* 17 Nov. 1993 Hance Dep. at 142–43. Under these facts, there exists a genuine issue of material fact as to whether Miller's removal of corporate documents and misrepresentations regarding her age and date of high school graduation would have resulted in her termination.

■■■■ As indicated, Beneficial also contends Miller committed job application fraud by inaccurately representing on the Application that she was first in her college class.[39] Beneficial Moving Brief at 14. While Beneficial has submitted evidence indicating Miller's representation in this regard was inac-

---

**38.** The Internal Investigation was concluded before 2 December 1988. *See* Miller Moving Transcripts, Ex. P–144. In spite of Beneficial's contention that the pendency of Internal Investigation prevented it from terminating Miller, Beneficial failed to terminate Miller during the one-month period between the conclusion of the Internal Investigation and the date upon which Miller left Beneficial.

**39.** Beneficial also disputes Miller's representation that she graduated *magna cum laude* from the University of Illinois. *See* Beneficial Moving Brief at 14 n. 15. The Academic Transcripts, however, indicate Miller graduated "with High Honors." Academic Transcripts at 4. Beneficial has not established, therefore, that Miller misrepresented her academic standing in this regard.

curate, Miller has submitted evidence indicating she had reason to believe the representation was accurate. Miller, as stated, received the Outstanding Senior in Education Award from an honorary society at the University of Illinois. The chairperson of that honorary society has certified that, on information and belief, the Outstanding Senior in Education Award is and has always been presented to the student at the University of Illinois "with the highest grade point average." Smith Cert., ¶ 4.

A current official of the University of Illinois has stated that, based on Miller's college grade point average and her receipt of the Outstanding Senior in Education Award, she was "among the top students academically in [her] class." 31 Jan. 1994 Letter. Miller was told by a professor upon her graduation from the University of Illinois that she was first in her class. 6 Apr. 1994 Miller Cert., ¶ 5; 20 Nov. 1993 Miller Dep. at 38. Under the facts currently at bar, it cannot be concluded as a matter of law that Miller fraudulently misrepresented her college class rank on her Application. Accordingly, Beneficial is not entitled to summary judgment based on this asserted inaccuracy.[40] See Malone, 826 F.Supp. at 376 (denying summary judgment based on after-acquired evidence defense where "there is a genuine issue for trial as to whether th[e] alleged misconduct occurred").

■■ Beneficial also argues Miller fraudulently misrepresented her college grade point average on her Application. It appears from the record that Miller's college grade point average was 4.598, rather than the 3.8 represented on her Application. *Compare* Application at 3 (representing grade point average as 3.8) *with* 31 January 1994 Letter (showing Miller's actual grade point average to be 4.598 on a 5.0 scale). If Beneficial accepted that the average represented on the Application was 3.8 out of 4.0, the discrepancy between the represented grade point average and the actual average appears not to have been so "material" as to warrant, by itself, application of the after-acquired evidence defense. *Johnson,* 955 F.2d at 414. Under these facts, Beneficial has not established, as a matter of law, its entitlement to prevail on the after-acquired evidence defense based on the asserted inaccuracy in Miller's college grade point average.[41]

■■ Beneficial further contends Miller misrepresented her employment experience on her Resume. Beneficial argues, specifically, that Miller's high school teaching experience was in truth half that represented on the Resume. See Beneficial Moving Brief at 15. Contrary to Beneficial's assertion, the present record establishes only that "some" of Miller's teaching experience was at the elementary school level. 20 Nov. 1993 Miller Dep. at 41. Miller has certified that any inaccuracy in her Resume regarding her teaching experience was inadvertent, and that she believed her Resume to be an "accurate summary of her teaching experience." 6 Apr. 1994 Miller Cert., ¶ 8.

For the purposes of this motion, Beneficial has provided no evidence that Miller inten-

---

**40.** The reason misrepresentations by Miller would constitute grounds for dismissal is that they exhibited dishonesty, which is defined as misconduct under both the Rules of Professional Conduct and Beneficial's company policy. *See* RPC 8.4(c) (It is "professional misconduct for a lawyer to [*inter alia*] engage in conduct involving dishonesty, fraud, deceit or misrepresentation."); Bulletin § 13.12 at GC59934 (defining "misconduct" as including, *inter alia,* "dishonesty"). If, on the other hand, inaccuracies were not fraudulent, but merely good faith errors, there may be no basis to conclude the inaccuracies constituted misconduct or that Beneficial would have terminated Miller for the inaccuracies.

**41.** As indicated, Beneficial contends in their Moving 12G that Miller misrepresented her date of college graduation in the Application. Beneficial Moving 12G, ¶ 41. Beneficial does not appear to press this point in their Moving Brief. *See* Beneficial Moving Brief at 15. In any event, Beneficial has not established, as a matter of law, that Miller fraudulently misrepresented her date of college graduation on her Application. As stated, the Application reflects the last digit of the year of Miller's college graduation as a three written over a two. Application at 3. Miller states that, when she completed the Application, she was unsure whether she graduated in 1952 or 1953. 6 April 1994 Miller Cert., ¶¶ 3–4. Based on the record at bar, it cannot be concluded, as a matter of law, that Miller misrepresented her date of college graduation.

tionally misrepresented her teaching experience on her Resume. If the majority of Miller's years of teaching were at the high school level, with only short forays at the elementary school level, her Resume may well be a substantially accurate and good faith summary of her teaching experience. Under such circumstances, Miller's omission of her elementary school teaching experience from her Resume may not be so "material" an inaccuracy as to entitle Beneficial to invoke the after-acquired evidence defense. *Johnson*, 955 F.2d at 414 (Materiality requirement is "necessary to prevent an employer from combing a discharged employee's record for evidence of any and all misrepresentations, no matter how minor or trivial, in an effort to avoid legal responsibility for an otherwise impermissible discharge."); *see Malone*, 826 F.Supp. at 376 (denying summary judgment because of existence of a genuine issue for trial whether th[e] alleged misconduct occurred). Beneficial has not established, beyond a genuine issue of material fact, that it is entitled to assert the after-acquired evidence defense based on the inaccuracies in the Resume regarding Miller's teaching experience.

■ Beneficial also argues Miller's Resume misrepresented her reasons for leaving her teaching jobs. Beneficial Moving Brief at 15. Beneficial points out that, whereas the Resume represented Miller left her teaching jobs "because of pregnancies," Miller testified she had left one job because she had relocated. *Compare* Resume at 1 *with* 20 Nov. 1993 Miller Dep. at 55.

The record does not indicate Miller's Resume misrepresented her reasons for leaving her teaching jobs. On her Resume, just below her statement regarding her pregnancies, Miller stated she resigned a teaching job in 1971 when her husband took a job in a different area. Resume at 1. Miller disclosed similar information in her Application,

where she stated she left teaching jobs because her husband "changed companies" and "to complete [her] third year of law school." Application at 2. Based on these facts, there is at least a genuine issue of material fact as to whether Miller fraudulently stated her reasons for leaving jobs on her Resume. *See Malone*, 826 F.Supp. at 376.

■ Beneficial contends Miller misrepresented her participation in the community activities listed on her Resume. In support of its assertion in this regard, Beneficial has submitted only evidence that the community organizations listed on the Resume do not have sufficient records to verify Miller's involvement; this evidence does not indicate Miller did not participate in these organizations. *See* Anderson Cert., Exs. EE, FF, UU, HH. The evidence submitted by Beneficial does not indicate, let alone establish as a matter of law, that Miller fraudulently misrepresented her involvement in the community organizations listed in the Resume. *See Malone*, 826 F.Supp. at 376.

■ Finally, Beneficial argues Miller fraudulently misrepresented her high school grade point average on her Application. As indicated, Miller stated on the Application that her high school grade point average was 3.5, whereas in truth it was 2.95. *Compare* Application at 3 *with* Academic Transcripts at 5. Miller disputes that this inaccuracy was intentional, and testified during deposition that the inaccuracy was the result of mistaken memory and estimation. *See* 20 Nov. 1993 Miller Dep. at 51. In the absence of any evidence from Beneficial that the inaccuracy was intentional, the issue of whether the representation was fraudulent is at least submissible to the jury. *See Malone*, 826 F.Supp. at 376; *see also Jalil*, 873 F.2d at 707 ("When [a party's] intent has been called into question, the matter is within the sole province of the factfinder.").[42]

---

**42.** There is also an issue of fact as to whether Beneficial would have fired Miller if it had known of her misrepresentation of her high school grade point average. Beneficial's records indicate that, in 1986, Beneficial learned an employee misrepresented that she graduated from high school. *See* Andersen Cert., Ex. CC at 19. Beneficial did not terminate that employee, but merely placed her on probation. *Id.*

Miller's misrepresentation, if intentional, was not nearly as serious as falsely representing that she graduated from high school. In light of these facts, there exists at least a genuine issue of material fact as to whether Miller would have been terminated for misrepresenting her high school grade point average. The existence of this issue precludes summary judgment based on

Beneficial has failed to establish the elements of the after-acquired evidence defense beyond a genuine issue of material fact. There exist genuine issues of fact as to whether many of the representations and statements asserted by Beneficial as grounds for the defense actually constituted fraud or misconduct. *See Malone*, 826 F.Supp. at 376. As to the remaining instances of misconduct, there exists a genuine issue of material fact as to whether Miller would have been terminated for this misconduct. *See DeVoe*, 782 F.Supp. at 546. Accordingly, based on the record currently at bar, Beneficial is not entitled to summary judgment based on the doctrine of after-acquired evidence.

### E. *Miller's Motion for Summary Judgment*

As indicated, Miller has cross-moved for summary judgment striking the Seventh Affirmative Defense and the Eighth Affirmative Defense. Miller bases her motion on two grounds. First, she contends the after-acquired evidence defense should be rejected as a matter of law. *See* Miller Moving Brief at 5. Second, Miller argues that it would be impossible for Beneficial to prove the after-acquired evidence defense at trial and that the defense, therefore, should not be submitted to the jury.

With respect to Miller's first asserted basis for summary judgment, the contours of the after-acquired evidence defense as adopted by this court are set forth above. *See supra* at 709–718. To the extent Miller's interpretation of the law is inconsistent with the law as discussed above, Miller's interpretation is rejected.

■■■ Miller's second asserted basis for summary judgment is equally lacking in merit. Though Beneficial has not established the elements of the after-acquired evidence defense as a matter of law, there is no basis upon which to conclude Beneficial could not establish the defense at trial. There is some indication in the record that Beneficial knew of Miller's misrepresentations as to her age and of her removal of documents in the fall of

the inaccuracy in Miller's grade point average as represented in the Application. *See Punahele*,

1988. *See supra* at 718–721. Based on this evidence, and on Beneficial's failure to take action to terminate Miller, Beneficial failed to establish, beyond a genuine issue of material fact, that it would have terminated Miller based on this misconduct. *Id.*

Miller has, however, submitted nothing to preclude Beneficial from producing facts to excuse its inaction and proving at trial that it would, in fact, have terminated Miller for the misconduct. Nor has Miller submitted anything to preclude Beneficial from explaining its January 1989 offer of re-employment to the jury and successfully arguing Miller would have been terminated. Miller's performance at Beneficial was regarded unevenly at best. *See* 1983 Bentrak; 1986 Bentrak; 1988 Bentrak. On at least one occasion, Miller was prompted by mixed evaluations to seek alternative employment. *See* Miller Opp. 12G, ¶ 17. Beneficial did, in fact, consider terminating Miller for known misconduct at least once during her employment. 30 June Ward Dep. at 171 (explaining that Ward considered terminating Miller for her June 1988 taping of the Perry Conversation).

Miller has, moreover, failed to address the several other instances of alleged misrepresentation relied upon by Beneficial in support of the Seventh Affirmative Defense. While Beneficial has failed to establish as a matter of law that these representations were fraudulent, Miller has submitted nothing to establish, beyond a genuine issue of material fact, that the representations were not fraudulent.

Under these facts, Miller has failed to establish as a matter of law that Beneficial cannot succeed on the Seventh Affirmative Defense or the Eighth Affirmative Defense. The issue of the after-acquired evidence defense in this case must be submitted to a jury for decision. Accordingly, Miller's cross-motion for summary judgment is denied.

### Conclusion

For the reasons stated, both Beneficial's motion for summary judgment dismissing the Amended Complaint and Miller's cross-motion for partial summary judgment striking

756 F.Supp. at 491.

the Seventh Affirmative Defense and the Eighth Affirmative Defense are denied.